# COURT OF APPEALS OF VIRGINIA

PUBLISHED

Present:  Chief Judge Decker, Judges Humphreys, Beales, Huff, O'Brien, AtLee, Malveaux,
          Athey, Fulton, Ortiz, Causey, Friedman, Chaney, Raphael, Lorish, Callins and White
Argued at Richmond, Virginia


MICHAEL MELVIN FARY

v.      Record No. 1079-21-2

COMMONWEALTH OF VIRGINIA

OPINION BY
JUDGE ROBERT J. HUMPHREYS
APRIL 18, 2023

UPON A REHEARING EN BANC

FROM THE CIRCUIT COURT OF KING WILLIAM COUNTY
Thomas B. Hoover, Judge

Devin G. Hensley (Martin, Ingles & Hensley Ltd., on brief), for
appellant.

Timothy J. Huffstutter, Assistant Attorney General (Jason S.
Miyares, Attorney General, on brief), for appellee.


After a bench trial, the Circuit Court of King William County convicted Michael Melvin

Fary of seven counts of attempted malicious wounding, in violation of Code §§ 18.2-26, 18.2-51,

and one count of misdemeanor reckless operation of a boat, in violation of Code § 29.1-738. On

appeal, a three-judge panel of this Court heard Fary's challenge to the sufficiency of the evidence

to support his convictions for attempted malicious wounding and affirmed the judgment of the

circuit court with one judge dissenting. *Fary v. Commonwealth*, No. 1079-21-2 (Va. Ct. App.

Aug. 23, 2022). This Court granted Fary's petition for rehearing en banc and stayed the panel

decision affirming the judgment of the circuit court. Rule 5A:35(b). Sitting en banc, the Court

considers anew the legal sufficiency of the evidence to support Fary's convictions for attempted

malicious wounding. This case also permits us to clarify and correct some of our precedent with

respect to appellate review of any alleged reasonable hypothesis of innocence.

BACKGROUND

On July 18, 2020, Douglas Creekmore ("Creekmore"), his wife, Lindsay Creekmore, and their one-year-old daughter were boating with friends on the Mattaponi River. Along for the boat ride were Gretchen Frayser and her three minor children. In total, seven people occupied the Creekmores' seventeen-foot fiberglass "Sunbird" bowrider boat. Creekmore was driving the Sunbird downriver when Ms. Creekmore, who was sitting in the seat forward of the driver's seat, alerted him that there was a boat not far ahead of them. The boat ahead of them was a sixteen-foot aluminum "jon boat," olive in color. Creekmore testified that instead of slowing quickly, which would cause a "huge wake towards the other . . . boat," he "stayed on the plane and went up to the right of the boat to try to keep as less wake as possible." He was traveling about twenty-two to twenty-four miles per hour as he moved around the jon boat. After passing the jon boat, Creekmore looked back to see if everything was okay; he saw the jon boat had turned and rocked but no one had fallen out.

In the jon boat were Fary and his girlfriend, Carrol Messler. They were returning from delivering fishing supplies to Fary's son when they ran out of gas. They were sitting in the middle of a narrow channel in the bend of the river while Fary switched the gas hose from the empty tank to a full tank. Fary became "pissed off" about the way the Sunbird vessel passed him at a close distance and "almost swamped" his boat. From a distance, Frayser could see that Fary appeared to be very upset and yelling right after the Sunbird passed his jon boat.

A couple of minutes after the Sunbird passed the jon boat, one of the minor children told Creekmore that Fary was following them. Creekmore looked back and saw Fary following about a quarter mile behind them. Creekmore continued on for fifteen to twenty-five minutes; Fary continued behind him. Creekmore continued downriver and passed Rainbow Acres Campground, thinking Fary might turn off there, but he did not. At this point Creekmore

believed Fary must be "really angry." Creekmore traveled about a half mile past Rainbow Acres, then decided to turn his boat around and head back to Rainbow Acres, thinking that if Fary was planning to confront him, he should be around other people as a safety measure. When Creekmore turned around, Fary turned around and followed him to Rainbow Acres.

At Rainbow Acres, Creekmore pulled up to the end of a fuel dock. Fary motored the jon boat close to the Sunbird. When Fary's motor was in neutral and about fifteen feet away from the Sunbird, Fary started yelling and cursing; he said, "You fucking wanna swamp me?" Creekmore apologized. Fary's demeanor was "hostile"; he stood up and called Creekmore a "motherfucker." Fary sat down, put his boat in gear, and slammed into the Sunbird at a 90-degree angle, in such a way that the jon boat came "up on top of [the Sunbird]" at the gunwale (the top portion of the hull) towards the stern, starboard side of the vessel. The children were screaming and crying. Three of the children were sitting on the rear seat forward of the transom, and one of them was hit on the side of the head by the jon boat as it rode up on the Sunbird.[1] The pitch of the jon boat as it was on the Sunbird was so steep that it made the jon boat slide back down into the water. Ms. Creekmore, who was seated near the bow of the boat, rushed to the back to check on the children. By this time, Fary was standing again and both men were cursing at each other.

Then, Fary sat back down, restarted his engine, and rammed into the Sunbird a second time. This time the jon boat came up on the Sunbird on the starboard side by the driver's seat and rose up to hit part of the hardware holding the canopy over the boat. Creekmore shoved the jon boat off from his boat with his hands. Frayser testified that Fary was cursing both times as he ran his boat into the Sunbird. Creekmore told Fary that he was crazy and he should go away. Fary threw his hands up and said, "I'm sorry," and drove back upriver.

---

[1] The child had a "goosebump" but did not sustain a concussion.

Howard Emory, an employee at Rainbow Acres, observed the incident and wrote down the jon boat's registration number and provided it to his supervisor. Mr. Emory testified at trial that initially he could not see the boats from his position on the dock because of the low tide, but he said the jon boat slammed into the larger boat that came in for gas, and then "[b]acked off[] and slammed into it a second time." He later said, "I never saw the little boat until he actually rammed the big boat. And the big boat was coming in on the righthand side of the pier, then the little boat jammed and then backed off, and he—this one came in and hit it again. So that's when I had the rope on the security boat."

As the Creekmores departed Rainbow Acres, Ms. Creekmore called the non-emergency police number to report the incident. Officer Daniel Rabago of Virginia Department of Wildlife Resources met the Creekmores at the Walkerton Boat Ramp, where he took pictures of the Sunbird and verbal statements from the Creekmores and Frayser. Officer Rabago then went to Fary's home, where he spoke with Fary and took pictures of the jon boat.

At trial, Officer Cameron Dobyns, a member of the boat incident reconstruction team at the Department of Wildlife Resources, testified to the reconstruction report he prepared after inspecting the Sunbird and the jon boat. During his detailed examination of both vessels, he noted recent damage, fresh scuff marks and scratches, and paint transfer from one boat to another. Based on his observations, he opined that the jon boat hit the Sunbird at a 90-degree horizontal angle, towards the stern on the starboard side, noting aluminum and olive drab paint transfer at a fresh gouge in the fiberglass of the Sunbird at the gunwale. Further forward on the starboard side, Officer Dobyns opined that the jon boat hit the Sunbird at a 150-degree horizontal angle and went up onto the starboard side of the Sunbird, hitting the gunwale, the hardware

- 4 -

extending above the gunwale to hold the canopy,[2] and the top of the windshield frame by the driver's seat before reentering the water. He found olive drab paint on each of these parts of the Sunbird. The damage to the Sunbird was cosmetic, and it remained operable after the incident.

Fary presented his own evidence. First, Messler testified that the jon boat ran into the Sunbird only once and it was because the Sunbird stopped abruptly in front of them near the dock at Rainbow Acres. She also testified that Fary was not angry and he was not cursing, but the people in the Sunbird were cursing at them. Fary testified that when he approached the Sunbird at the Rainbow Acres dock, he planned to throw a wake, "to wake him the way he did me." He said that he tried to hit a pole to stop his boat but the wake pushed him into the Sunbird and that he hit the boat on accident. He also testified that his boat ran into the Sunbird only once. In closing argument, defense counsel argued that Fary regrets what happened, but he had no intent to maim, maliciously hurt, or kill any of the people on the boat.

The circuit court found that the physical evidence did not support Fary's version of the incident that he only hit the Sunbird one time and that was by accident, bumping off of a pole near the dock. The circuit court found Fary guilty on "all seven counts of attempted malicious wounding when you look [at] all the facts in the case."

## ANALYSIS

Fary's single assignment of error is that the circuit court erred by convicting him of seven counts of attempted malicious wounding because the evidence was insufficient to prove that he had the specific intent to maliciously wound anyone when his boat contacted the victims' boat.

"Under the governing standard, 'we review factfinding with the highest degree of appellate deference.'" *Commonwealth v. Barney*, ___ Va. ___, ___ (Mar. 16, 2023) (quoting

---

[2] The pictures of markings on the boats indicate that the highest point of olive drab paint transfer was a foot and a half above the gunwale on the canopy hardware of the Sunbird.

*Bowman v. Commonwealth*, 290 Va. 492, 496 (2015)). "When presented with a sufficiency-of-the-evidence challenge in criminal cases, we review the evidence in the 'light most favorable' to the Commonwealth, the prevailing party in the trial court." *Id.* at ___ (quoting *Commonwealth v. Hudson*, 265 Va. 505, 514 (2003)). "Viewing the record through this evidentiary prism requires us to 'discard the evidence of the accused in conflict with that of the Commonwealth, and regard as true all the credible evidence favorable to the Commonwealth and all fair inferences to be drawn therefrom.'" *Id.* at ___ (quoting *Commonwealth v. Perkins*, 295 Va. 323, 323-24 (2018) (per curiam)).

"This deferential principle applies not only to 'matters of witness credibility' but also to the factfinder's 'interpretation of all of the evidence . . . ' presented at trial." *Id.* at ___ (quoting *Meade v. Commonwealth*, 74 Va. App. 796, 806 (2022)). The fact finder views all of the evidence "to determine what it believes happened; we, on appellate review, view . . . evidence not to determine what we think happened, but for the limited purpose of determining whether any rational factfinder could have viewed it as the [factfinder] did." *Id.* at ___ (second alteration in original) (quoting *Meade*, 74 Va. App. at 806). "[A]n appellate court 'does not ask itself whether *it* believes that the evidence at the trial established guilt beyond a reasonable doubt.'" *Fletcher v. Commonwealth*, 72 Va. App. 493, 501 (2020) (quoting *Secret v. Commonwealth*, 296 Va. 204, 228 (2018)). "[I]t is not for this [C]ourt to say that the evidence does or does not establish [the defendant's] guilt beyond a reasonable doubt because as an original proposition it might have reached a different conclusion." *Barney*, ___ Va. at ___ (second and third alterations in original) (quoting *Cobb v. Commonwealth*, 152 Va. 941, 953 (1929)). "It has long been deemed an abuse of the appellate powers to set aside a verdict and judgment, because an appellate court, from the evidence as written down, would not have concurred in the verdict." *Id.* at ___ (quoting *Perkins*, 295 Va. at 327). "When conducting a sufficiency review on appeal, we

do not 'distinguish between direct and circumstantial evidence' because the factfinder 'is entitled to consider all of the evidence, without distinction, in reaching its determination.'" *Id.* at ___ (quoting *Commonwealth v. Moseley*, 293 Va. 455, 463 (2017)). "The judgment of a trial court sitting without a jury is entitled to the same weight as a jury verdict and will not be set aside unless it appears from the evidence that the judgment is plainly wrong or without evidence to support it." *Fletcher*, 72 Va. App. at 501 (quoting *Wood v. Commonwealth*, 57 Va. App. 286, 292 (2010)).

Code § 18.2-51 states, "[i]f any person maliciously shoot, stab, cut, or wound any person or by any means cause him bodily injury, with the intent to maim, disfigure, disable, or kill, he shall . . . be guilty of a Class 3 felony." "To be guilty under Code § 18.2-51, a person must intend to permanently, not merely temporarily, harm another person." *Johnson v. Commonwealth*, 53 Va. App. 79, 101 (2008). "An attempt to commit a crime is composed of two elements: (1) [t]he intent to commit it; and (2) a direct, ineffectual act done towards its commission." *Merritt v. Commonwealth*, 164 Va. 653, 657 (1935).

"Intent is the purpose formed in a person's mind and may, like any other fact, be shown by circumstances, including the 'words or conduct' of the alleged offender." *Secret*, 296 Va. at 228-29 (citations omitted). Indeed, intent "most often is[] proven by circumstantial evidence and the reasonable inferences to be drawn from proven facts." *Id.* at 229 (quoting *Viney v. Commonwealth*, 269 Va. 296, 301 (2005)). "Moreover, in criminal attempt cases, 'the fact finder is often allowed broad latitude in determining the specific intent of the actor.'" *Siquina v. Commonwealth*, 28 Va. App. 694, 700 (1998) (quoting *Fortune v. Commonwealth*, 14 Va. App. 225, 229 (1992)). Of course, "[s]urmise and speculation as to the existence of the intent are not sufficient" to support a conviction. *Dixon v. Commonwealth*, 197 Va. 380, 382 (1955). The determination of a defendant's intent "presents a factual question which lies peculiarly within the

province of the [trier of fact]." *Hughes v. Commonwealth*, 18 Va. App. 510, 519 (1994) (en

banc) (quoting *Ingram v. Commonwealth*, 192 Va. 794, 802 (1951)).

On appeal, Fary reasserts his trial testimony that he only intended to throw a wake on the

Creekmores' boat and that he accidentally ran into their boat when he slowed down and the wake

pushed his boat into the Creekmores' boat. Fary acknowledges that he "acted recklessly" when

he approached the Creekmores' boat but argues that his recklessness did not amount to the

specific intent required for the attempted malicious wounding convictions. We disagree that the

evidence was only sufficient to prove his recklessness.

Contrary to the position of the dissent,

> the issue upon appellate review in a case like this is not whether
> there is some evidence to support [the] defendant's hypotheses.
> Rather, the issue is whether a reasonable fact finder, upon
> consideration of all the evidence, could have rejected defendant's
> theories and found him guilty of the charged offense beyond a
> reasonable doubt.

*Coles v. Commonwealth*, 270 Va. 585, 589 (2005). "Properly understood, the

reasonable-hypothesis principle is not a discrete rule unto itself." *Vasquez v. Commonwealth*,

291 Va. 232, 249 (2016). "The statement that circumstantial evidence must exclude every

reasonable theory of innocence is simply another way of stating that the Commonwealth has the

burden of proof beyond a reasonable doubt." *Id.* at 249-50 (quoting *Hudson*, 265 Va. at 513).

"[N]o matter how this burden is framed, the factfinder ultimately remains responsible for

weighing the evidence." *Moseley*, 293 Va. at 464. "In that capacity, the factfinder determines

which reasonable inferences should be drawn from the evidence, and whether to reject as

unreasonable the hypotheses of innocence advanced by a defendant." *Id.* "Whether an alternate

hypothesis of innocence is reasonable is a question of fact and, therefore, is binding on appeal

unless plainly wrong." *Lucas v. Commonwealth*, 75 Va. App. 334, 348 (2022) (quoting *Emerson*

*v. Commonwealth*, 43 Va. App. 263, 277 (2004)). "If there is evidentiary support for the

conviction, the reviewing court is not permitted to substitute its own judgment, even if its opinion might differ from the conclusions reached by the finder of fact at the trial." *Id.* at 342 (quoting *McGowan v. Commonwealth*, 72 Va. App. 513, 521 (2020)). "These principles apply with equal force to bench trials no differently than to jury trials." *Moseley*, 293 Va. at 463 (quoting *Vasquez*, 291 Va. at 249).

Fary relies upon *Haywood v. Commonwealth*, 20 Va. App. 562 (1995), to support his position that the Commonwealth did not sufficiently prove specific intent. The question before this Court was whether Haywood, who was charged with two counts of attempted capital murder, formed the specific intent to use his vehicle as a weapon for the purpose of murdering two police officers. *Id.* at 566. Haywood damaged a man's vehicle with a bat and fled the crime scene in his truck. *Id.* at 564. As Haywood sped down the road to escape, two police officers placed their vehicles at different points in the road to deter his flight. *Id.* at 564-65. Both officers moved their vehicles to avoid impact. *Id.* This Court reversed Haywood's convictions because the Commonwealth's "circumstantial evidence did not exclude a reasonable hypothesis of innocence." *Id.* at 568.

We are unconvinced by Fary's reliance on *Haywood* because not only are the facts of *Haywood* easily distinguishable from the case at bar,[3] but the analysis applied in *Haywood* is inconsistent with settled law.

The analytical flaw in *Haywood* is this Court's reasoning that,

> while the evidence may support [a] hypothesis that Haywood acted with malice and intended to run over or through anyone or anything that got in his way, the Commonwealth's evidence failed to exclude *another* reasonable hypothesis of Haywood's acts which, if true, would exonerate him of the charges of attempted capital murder of the police officers.

---

[3] The facts of the two cases are distinguished most notably because Haywood's close encounter with the police vehicles was only because they were placed in the path of his escape route, whereas Fary pursued the Creekmores and purposefully rammed into their boat twice.

- 9 -

*Id.* at 567 (emphasis added). This Court reversed Haywood's convictions on the basis that Haywood's hypothesis of innocence was reasonable. *Id.* at 568. This reasoning does not square with foundational principles of appellate review that the fact finder's "judgment is presumed correct and will not be disturbed unless it is 'plainly wrong or without evidence to support it.'" *Moseley*, 293 Va. at 463 (quoting Code § 8.01-680). As stated above, the appropriate issue upon appellate review is "whether a reasonable fact finder, upon consideration of all the evidence, could have rejected defendant's theories and found him guilty of the charged offense beyond a reasonable doubt." *Coles*, 270 Va. at 589. Ultimately, despite the flawed analysis, the *Haywood* Court reached the right result, as no evidence in the record supported the circuit court's finding that Haywood had the specific intent to kill. However, a reversal based on an *appellate court* giving credence to Haywood's hypothesis of innocence is inconsistent with the required standard of appellate review.

Similarly, in *Crawley v. Commonwealth*, 25 Va. App. 768 (1997), this Court reversed Crawley's conviction of attempted malicious wounding because the evidence raised only a suspicion that Crawley had the requisite specific intent. *Id.* at 774-75. Crawley pulled out a gun and shot three times striking the victim while a woman was standing next to the victim. *Id.* at 771. The circuit court convicted Crawley of attempted malicious wounding of the woman standing next to the victim. *Id.* at 770. Despite the proximity of the victim and the woman at the time of the shooting, there was no supporting evidence that Crawley had the specific intent to maliciously wound the woman. *Id.* at 775.

As in *Haywood*, this Court in *Crawley* reached the right result in concluding that the evidence was insufficient to prove that he had the specific intent to kill the woman. However, in what amounts to erroneous dicta: the Court further reasoned that the evidence "failed to exclude as a reasonable hypothesis the possibility" that Crawley only intended to shoot her companion.

*Crawley*, 25 Va. App. at 775. As in *Haywood*, our judgment was ultimately correct because the record simply was devoid of any evidence of Crawley's specific intent to harm the woman rather than the man he clearly intended to shoot, and the transferred intent doctrine is inapplicable to an attempted crime. *Id.* at 773-74.

Our Supreme Court's recent decision in *Barney* supports our judgment regarding *Haywood* and *Crawley*, and we take this opportunity to clarify and correct the analyses of *Haywood* and *Crawley* by overruling them to the extent that they might be read as allowing an appellate court to substitute its view of a defendant's hypothesis of innocence that has been reasonably rejected by the fact finder at trial.

As the Supreme Court has admonished and we here emphasize, it is the *fact finder*, not this Court, that determines whether a defendant's hypothesis is reasonable. *Hudson*, 265 Va. at 514 ("[T]he Court of Appeals' analysis did not give proper deference to the province of the jury to consider the testimony and the credibility of the witnesses to determine reasonable inferences from such evidence, and reject as unreasonable the hypotheses offered by Hudson."). Giving due deference to the trier of fact, this Court may only review a factual finding to determine if it is "plainly wrong or without evidence to support it." *Moseley*, 293 Va. at 466 (quoting Code § 8.01-680). If the result is one that reasonably *could* be reached after consideration of the totality of the circumstances, then we may not substitute our judgment of any factual findings.[4] *Barney*, ___ Va. at ___.

---

[4] Aside the strident and erroneous rhetoric of the dissent that we are "doing away with the reasonable-hypothesis-of-innocence principle," the basic flaw in the analysis of the dissent is its contention that the role of this Court is "to determine whether, viewing the evidence in the light most favorable to the Commonwealth, the trial court found that the evidence established, *beyond a reasonable doubt*, that the defendant engaged in conduct that met all the elements of the criminal offense charged." (Emphasis added.) The appellate courts of the Commonwealth have no such role in determining the existence of "reasonable doubt." Indeed, that is precisely the point made in all of the cases that the dissent fails to address, much less distinguish—the

In *Holley v. Commonwealth*, 44 Va. App. 228 (2004), this Court addressed the same issue before us today, whether the evidence was sufficient to prove that Holley acted with specific intent to maim, disfigure, disable, or kill to support his conviction of attempted malicious wounding. *Id.* at 229-30. This Court affirmed Holley's conviction of attempted malicious wounding of a police officer, citing as evidence of Holley's specific intent: the officer had stepped out of his patrol car and drawn his weapon, Holley looked in his direction, accelerated his van from a stopped position and drove right at the officer, without making any effort to veer or avoid striking the officer, who dove out of the way. *Id.* at 237. The Court distinguished the facts of this case from *Haywood*:

> Specifically, in *Haywood*, the defendant never halted his truck, but instead continued driving at a high rate of speed despite the presence of the police cars that had been placed in his path [as he was driving to escape]. The evidence did not show that Haywood knew that an officer was in the car and that Haywood specifically intended to maim, disable, disfigure or kill an officer.

*Id.* at 236 (citing *Haywood*, 20 Va. App. at 564-65).

Another case pertinent to our analysis here is *Stevens v. Commonwealth*, 38 Va. App. 528 (2002). "In *Stevens*, this Court affirmed a conviction for the attempted capital murder of a law enforcement officer where the defendant 'came to a stop' approximately ten feet away from a stopped police [officer on a motorcycle], 'and, looking right at [the police officer], rapidly accelerated directly toward him.'" *Holley*, 44 Va. App. at 236 (second alteration in original)

---

precedents in *Barney*, *Hudson*, *Moseley*, *Lucas, McGowan*, and *Emerson*, discussed above, all clearly place the responsibility of determining whether a reasonable hypothesis other than guilt flows from the evidence *exclusively* on the fact finder.

Instead, our dissenting colleagues have reweighed the evidence, reassigned the credibility of the witnesses, and otherwise engaged in the factfinding exercises that the above precedents hold are the sole responsibility of a trial jury or, as in this case, a trial judge, who was in a far better position to do so than our dissenting colleagues.

As our Supreme Court most recently reiterated in *Barney*, when, as here, there is evidence in the record that, if believed by a fact finder, would satisfy each element of an offense, our task in a sufficiency of the evidence analysis is done.

(quoting *Stevens*, 38 Va. App. at 537). "Because Stevens 'deliberately turned his car in [the officer's] direction and drove toward him,' we concluded that the evidence was sufficient to prove that Stevens 'had the requisite specific intent to use his vehicle as a weapon for the unequivocal purpose of murdering Officer Hines.'" *Id.* (alteration in original) (quoting *Stevens*, 38 Va. App. at 537).

In the present case, Fary became angry when the Creekmores' boat passed his boat in a way that rocked his boat. He then followed the Creekmores' boat for fifteen minutes, even after the Creekmores made a U-turn to head to Rainbow Acres. The seven passengers aboard the Creekmores' boat were in Fary's plain view. After the Creekmores docked their boat, Fary approached at a slowed speed. He stood up and yelled and cursed at Creekmore. He sat back down, put his motor in gear, and rammed the Sunbird with enough force that it rode up on the gunwale of the Sunbird. The jon boat intruded into the passenger compartment, striking a child in the head. The jon boat slid back down into the water. Fary yelled and cursed some more. Then he engaged his engine with enough power to ride up on the side of the Sunbird again, to a point that it reached a foot and a half above the boat gunwale, leaving paint on the hardware to the canopy and the top portion of the windshield. Thus, like in *Holley* and *Stevens*, Fary was idling near the victims when he twice aimed his motor vehicle, in this case a boat, at them and accelerated towards them, ramming the Sunbird, riding up and over its gunwale. Fary did so with seven unrestrained passengers in plain view in the Sunbird, and where the passenger compartment was not enclosed with a cabin or any other protective hardware.

"Factfinders have the decisional power 'to draw reasonable inferences from basic facts to ultimate facts,' *Musacchio v. United States*, 577 U.S. 237, 243 (2016) (citation omitted), and 'those inferences cannot be upended on appeal unless' they are 'so attenuated that they "push 'into the realm of non sequitur,'"'" *Perkins*, 295 Va. at 332 (citations omitted)." *Barney*, ___

Va. at ___.  A rational fact finder could conclude that Fary rammed into the Creekmores' boat using his boat as a weapon, *see Essex v. Commonwealth*, 228 Va. 273, 281 (1984) ("A motor vehicle wrongfully used, can be a weapon as deadly as a gun or a knife."), and that he twice aimed that weapon at the seven passengers who were vulnerable to Fary's oncoming boat and the inherent perils of direct injury and/or falling in the water with the risk of drowning.[5]  Thus, there was sufficient evidence from which a fact finder could conclude that Fary harbored the specific intent to maliciously maim, disable, wound, or kill the seven passengers.  The circuit court's conclusion was not plainly wrong or without evidence to support it.

For the foregoing reasons, we affirm the judgment of the circuit court.

*Affirmed.*

---

[5] In usurping the factfinding function of the circuit court, the dissent concludes Fary lacked the specific intent to maim, disfigure, disable *or* kill by ignoring the principle that "[i]t is permissible for the fact finder to infer that every person intends the natural, probable consequences of his or her actions."  *Secret*, 296 Va. at 229 (collecting cases).

Ortiz, J., concurring.

Although I agree with the majority that the standard of review compels an affirmance, I do not find it necessary for this Court to "clarify and correct" our precedent on the reasonable-hypothesis-of-innocence principle. As the dissent points out, the principle has long been an important part of our criminal jurisprudence, cited repeatedly by both this Court and our Supreme Court. We have no reason presented by the facts of this case to overturn or limit it. When reviewing the sufficiency of the evidence on appeal, we neither rubber-stamp a trial court's rejection of the defendant's reasonable hypothesis of innocence nor reweigh the evidence and reach our own conclusion. Rather, we examine "whether a rational factfinder could have found that the incriminating evidence renders the hypothesis of innocence unreasonable." *Vasquez v. Commonwealth*, 291 Va. 232, 250 (2016). Here, the trial court was not plainly wrong in rejecting Fary's hypothesis of innocence, because there was at least some evidence inconsistent with the hypothesis.

The dissent summarizes our caselaw on the reasonable-hypothesis-of-innocence principle and correctly points out that the principle "is not a discrete rule unto itself," but "simply another way of stating that the Commonwealth has the burden of proof beyond a reasonable doubt." *Id.* at 249-50. The reasonable-hypothesis-of-innocence principle is that burden of proof applied to circumstantial cases. "When the evidence is wholly circumstantial . . . all necessary circumstances proved must be consistent with guilt and inconsistent with innocence and exclude every reasonable hypothesis of innocence." *Inge v. Commonwealth*, 217 Va. 360, 366 (1976). While the majority correctly points out that the factfinder "determines whether a defendant's hypothesis is reasonable," that determination is not immune from appellate review, but subject to deferential review. Otherwise, it would have been meaningless for this Court and the Supreme Court to repeatedly cite the reasonable-hypothesis-of-innocence principle on appeal.

- 15 -

This Court's decisions in *Haywood v. Commonwealth*, 20 Va. App. 562 (1995), and *Crawley v. Commonwealth*, 25 Va. App. 768 (1997), were consistent with these principles. In *Haywood*, we reversed Haywood's convictions of attempted capital murder because of a reasonable hypothesis that in driving at a high speed and almost colliding with two police vehicles, Haywood's intent was to flee from apprehension, rather than to murder the police officers. *Id.* at 567-68. The reasoning was correct because the Commonwealth presented *no evidence* that was inconsistent with Haywood's hypothesis of innocence. The fact that he was driving fast and refused to slow down was consistent with the explanation that he was attempting to avoid apprehension.

The majority opines that rather than basing our decision on Haywood's hypothesis of innocence, we should have simply found that the Commonwealth failed to prove Haywood's intent to kill the officers. However, had we not considered Haywood's reasonable hypothesis of innocence, we would have easily upheld the trial court's decision, given our highly deferential standard of review. Haywood was driving at 55 miles per hour toward a police car with activated siren and red lights, and he refused to slow down. *Id.* at 565. The trial court "inferred from Haywood's acts that he intended to kill the police officers," *id.* at 567, and we could hardly have found the conclusion plainly wrong because, as the majority notes, "[i]t is permissible for the fact finder to infer that every person intends the natural, probable consequences of his or her actions," *Secret v. Commonwealth*, 296 Va. 204, 229 (2018). The trial court's reversible error in *Haywood* was not inferring Haywood's intent from his action, but arbitrarily rejecting his reasonable hypothesis of innocence without any evidence.

Similarly, we correctly applied the reasonable-hypothesis-of-innocence principle in *Crawley*. Crawley shot the victim, Acree, in the hip and narrowly missed another individual, Newman, who was "standing right beside" Acree. *Crawley*, 25 Va. App. at 771. In addition to

- 16 -

maliciously wounding Acree, Crawley was also convicted of attempting to maliciously wound Newman. *Id.* at 770-71. On appeal, we reversed Crawley's attempted malicious wounding conviction, because the circumstantial evidence failed to exclude the reasonable hypothesis that Crawley only intended to shoot Acree. *Id.* Again, our reasoning was correct because the Commonwealth presented *no evidence* inconsistent with Crawley's hypothesis of innocence.

The majority suggests that rather than considering Crawley's reasonable hypothesis of innocence in that case, we should have simply concluded that the record "was devoid of any evidence of Crawley's specific intent to harm" Newman. But had we not considered Crawley's hypothesis of innocence, we could have affirmed the conviction because—given our deferential standard of review on appeal—the mere fact that Crawley shot in Newman's direction and only narrowly missed her would likely be sufficient to support the trial court's inference that Crawley intended the "natural, probable consequences" of his action. *Secret*, 296 Va. at 229.

Therefore, I disagree with the majority that our reasonings in *Haywood* and *Crawley* were erroneous or dicta. More importantly, the facts of the instant case do not require us to revisit *Haywood* and *Crawley*. *See Commonwealth v. Swann*, 290 Va. 194, 196 (2015) ("The doctrine of judicial restraint dictates that we decide cases on the best and narrowest grounds available."). Unlike *Haywood* and *Crawley*, here, the trial court's rejection of Fary's hypothesis of innocence was not arbitrary, as it was based on evidence inconsistent with the hypothesis.

Grounded in expert and eyewitness testimony, the trial court found that Fary's jon boat hit the Sunbird twice. The trial court explicitly noted that it was not "just a bump to get [Creekmore's] attention"; Fary "hit [the Sunbird] large enough that he went up, came down, and hits it a second time." Viewed in the light most favorable to the Commonwealth, the evidence was inconsistent with the alternative hypothesis cited by the dissent that Fary intended "to merely damage the boat." The first collision already damaged the Sunbird, leaving sufficient

- 17 -

marks and scratches for Officer Dobyns to conclude that the jon boat hit the Sunbird two separate times. The hypothesis that Fary merely intended to damage the Sunbird could hardly explain why he hit it a second time. Moreover, Fary's own testimony suggests that he had not even intended to *damage* the Sunbird. Rather, he claimed that he was simply going to "swing around behind them and throw a wake up . . . to wake him the way he did me." The hypothesis of innocence Fary presented at trial, that he merely intended to "wake" the Sunbird, was thus even more inconsistent with the evidence. As the trial court noted, a "small, aluminum jon boat" could hardly "wake the larger fiberglass boat," but could instead "run into it." The trial court thus did not arbitrarily discredit Fary's testimony and reject his hypothesis of innocence, because the evidence contradicted them.

Because the trial court's finding was not plainly wrong or without evidence to support it, I concur in the majority's affirmance of Fary's convictions. I would not revisit our precedent on the principle of reasonable hypothesis of innocence but would simply find that the trial court's rejection of that hypothesis was based on sufficient evidence.

Causey, J., with whom Friedman, Chaney, Raphael, Lorish and Callins, JJ., join, dissenting.

The trial court found Michael Melvin Fary guilty of seven counts of attempted malicious wounding for twice propelling his jon boat into the Creekmores' larger boat—one conviction each for the seven people aboard. The result of this incident for the Creekmores included cosmetic scratches to the exterior of their boat and one passenger with a "slight injury." The result for Fary was a sentence of five years of incarceration on each of the seven convictions, with a total active sentence of two years and suspended time of 33 years. Because the Commonwealth failed to establish the requisite mens rea for attempted malicious wounding and exclude the reasonable hypothesis of innocence that flowed from the evidence—that Fary merely intended to scare Mr. Creekmore and damage his boat—the majority errs in affirming Fary's convictions. The majority compounds its error by undercutting two of this Court's prior cases that have applied the reasonable-hypothesis-of-innocence principle. Because the majority's analysis and conclusion are deeply flawed, we respectfully dissent.

First, we consider the long history of the reasonable-hypothesis-of-innocence principle in Virginia, how it is akin to ensuring all elements of the offense are proven, and why the majority's analysis is wrong to suggest that this principle is somehow no longer part of Virginia law. Second, we discuss how the majority is wrong to undermine two of our precedents that correctly applied these principles. Third, applying that principle here, the evidence shows that the Commonwealth failed to prove that Fary had the requisite specific intent to maim, disfigure, disable, or kill, and not merely the intent to scare the Creekmores and damage their boat.[6]

---

[6] The malicious wounding statute states that it is a crime to "maliciously shoot, stab, cut, or wound any person or by any means cause him bodily injury, *with the intent to maim, disfigure, disable, or kill*[.]" Code § 18.2-51 (emphasis added). "[T]he word 'maim' . . . means to violently deprive another of the use of such of his members as may render him less able in fighting either to defend himself or to annoy his adversary"; "the word 'disfigure' means to inflict a bodily injury which constitutes a permanent disfigurement of the injured person"; and

- 19 -

Finally, even without relying on the reasonable-hypothesis-of-innocence principle, we would hold that the evidence is insufficient to establish the necessary intent.

### A. The reasonable-hypothesis-of-innocence inquiry reflects settled law.

The reasonable-hypothesis-of-innocence principle is integral to our jurisprudence. "'[T]he evidence supporting a conviction *must "exclude every reasonable hypothesis of innocence"* that flows from the evidence.'" *Jennings v. Commonwealth*, 67 Va. App. 620, 628 (2017) (emphasis added) (quoting *Thorne v. Commonwealth*, 66 Va. App. 248, 254 (2016)). "'Whether an alternative hypothesis of innocence is reasonable is a question of fact' that will be reversed on appeal only if plainly wrong." *Id.* (quoting *Stevens v. Commonwealth*, 38 Va. App. 528, 535 (2002)). On appeal, we ask "only whether a reasonable finder of fact could have rejected the defense theories and found the defendant guilty beyond a reasonable doubt." *Id.* (quoting *Thorne*, 66 Va. App. at 254).

The Supreme Court's decision in *Vasquez v. Commonwealth*, 291 Va. 232 (2016), cited by the majority, did not eliminate the reasonable-hypothesis-of-innocence principle. To be sure, the Court there explained that the "principle is not a discrete rule unto itself," but "'simply another way of stating that the Commonwealth has the burden of proof beyond a reasonable doubt.'" *Id.* at 249-50 (quoting *Commonwealth v. Hudson*, 265 Va. 505, 513 (2003)). But *Vasquez* did not expunge the doctrine from our law. To the contrary, the Court said that the principle "echoes 'the standard applicable to every criminal case.'" *Id.* at 250 (quoting *Cook v. Commonwealth*, 226 Va. 427, 433 (1983)).

---

"the word 'disable' means to inflict a bodily injury which permanently disables the injured person." *Davis v. Commonwealth*, 150 Va. 611, 616 (1928) (reciting trial court's jury instructions, when the defendant was indicted for malicious wounding, but the court then convicted the defendant for assault and battery).

*Vasquez* then repeated what remains black-letter law: "a factfinder cannot 'arbitrarily' choose, as between two equally plausible interpretations of a fact, one that incriminates the defendant." *Id.* (quoting *Dixon v. Commonwealth*, 162 Va. 798, 803 (1934)). The Court put that point, again, in reasonable-hypothesis terms: "When examining an alternate hypothesis of innocence, the question is not whether 'some evidence' supports the hypothesis, but whether a rational factfinder could have found that the incriminating evidence renders the hypothesis of innocence unreasonable." *Id.* (quoting *Hudson*, 265 Va. at 513). In other words, when the evidence supports two reasonable conclusions, only one of which leads to a finding of guilt, the factfinder cannot arbitrarily pick the one that leads to guilt.

The reasonable-hypothesis-of-innocence principle has remained very much alive in the Supreme Court's jurisprudence since *Vasquez*. That Court has repeatedly cited it.[7] And so have we.[8] As we put it in *Kelley v. Commonwealth*, 69 Va. App. 617 (2019), "[t]he 'reasonable hypothesis of innocence' concept is . . . well defined." *Id.* at 629. The principle has particular salience when the Commonwealth's evidence of guilt is founded on circumstantial evidence. In such cases, the Commonwealth must "put on enough circumstantial evidence such that a reasonable [fact finder] could have rejected [the] defendant's [hypothesis] of innocence." *Park*

---

[7] *See, e.g.*, *Haas v. Commonwealth*, 299 Va. 465, 468 (2021); *Gerald v. Commonwealth*, 295 Va. 469, 482 n.8 (2018); *Commonwealth v. Moseley*, 293 Va. 455, 464 (2017).

[8] *See, e.g.*, *Lucas v. Commonwealth*, 75 Va. App. 334, 348 (2022); *Park v. Commonwealth*, 74 Va. App. 635, 654 (2022); *Ray v. Commonwealth*, 74 Va. App. 291, 309 (2022); *Thompson v. Commonwealth*, 73 Va. App. 721, 732-33 (2021); *Bagley v. Commonwealth*, 73 Va. App. 1, 27 (2021); *Blackwell v. Commonwealth*, 73 Va. App. 30, 55 n.9 (2021); *Williams v. Commonwealth*, 71 Va. App. 462, 485-86 (2020); *Young v. Commonwealth*, 70 Va. App. 646, 653-54 (2019); *Rams v. Commonwealth*, 70 Va. App. 12, 27-28 (2019); *Kelley v. Commonwealth*, 69 Va. App. 617, 629 (2019); *Bennett v. Commonwealth*, 69 Va. App. 475, 492 (2018); *Stickle v. Commonwealth*, 68 Va. App. 321, 342 (2017); *Edwards v. Commonwealth*, 68 Va. App. 284, 304 (2017); *Burrous v. Commonwealth*, 68 Va. App. 275, 282 (2017); *White v. Commonwealth*, 68 Va. App. 241, 252-53 (2017); *Jennings*, 67 Va. App. at 626; *Ragland v. Commonwealth*, 67 Va. App. 519, 531 (2017); *Banks v. Commonwealth*, 67 Va. App. 273, 291 (2017); *Thorne*, 66 Va. App. at 254.

*v. Commonwealth*, 74 Va. App. 635, 654 (2022) (alterations in original) (quoting *Davis v. Commonwealth*, 65 Va. App. 485, 502 (2015)). For example, in reversing the defendant's robbery conviction in *Jennings*, we held that "the evidence did not 'exclude every reasonable hypothesis of innocence'" because the DNA found on the robber's clothes—the only evidence tying the defendant to the crime—came from *multiple* persons, including the defendant. 67 Va. App. at 628 (quoting *Thorne*, 66 Va. App. at 254).

In this way, arguments that the evidence has not excluded a reasonable hypothesis of innocence and does not meet all the elements of the crime are just different ways of arguing that the Commonwealth has not proved all the elements of a crime beyond a reasonable doubt. In cases when this Court or the Supreme Court has held that evidence was insufficient to meet an element of a crime, it has necessarily implied that an innocent explanation exists for the facts before it, and thus, that the trial court's finding of guilt was unreasonable. *See, e.g.*, *Yerling v. Commonwealth*, 71 Va. App. 527, 535-36 (2020) (reversing the defendant's conviction for possession of a controlled substance when there was "insufficient evidence to demonstrate that [the defendant] was aware of either the presence or nature of the [controlled substance] found," implying instead that it was more reasonable that the defendant was *not* aware of the presence of the controlled substance); *Maxwell v. Commonwealth*, 275 Va. 437, 444 (2008) (same).

Often, both the reasonable-hypothesis-of-innocence inquiry and satisfaction-of-all-elements-of-the-offense inquiry require us to determine whether, viewing the evidence in the light most favorable to the Commonwealth, the trial court found that the evidence established, beyond a *reasonable* doubt, that the defendant engaged in conduct that met all the elements of the criminal offense charged. If we determine that the trial court was unreasonable in so deciding, we necessarily decide that the defendant engaged in conduct that did not meet the elements of the offense—conduct that is innocent of the offense charged.

The standard of review for each inquiry insulates a conviction from appellate review only to the extent that the conviction was *reasonable*. We are not bound to a verdict that is "plainly wrong or without evidence to support it." *Kelly v. Commonwealth*, 41 Va. App. 250, 257 (2003) (en banc). The deference that we give to the factfinder is generally limited to its judgment of credibility—we cannot decide that certain evidence is more reliable than other evidence. We *can* decide, however, whether the trial court was *reasonable* in determining that the evidence, viewed in the light most favorable to the Commonwealth, established all the elements of a crime beyond a reasonable doubt. This is so because the Commonwealth bears the burden of proving each element of a crime beyond a reasonable doubt, and a trial court's conviction of a defendant that falls short of this standard is reversible error. *See Kenner v. Commonwealth*, 71 Va. App. 279, 295 (2019) ("It is axiomatic that the Commonwealth is required to prove every element of a charged offense beyond a reasonable doubt."), *aff'd*, 299 Va. 414 (2021); *Baldwin v. Commonwealth*, 274 Va. 276, 280 (2007) (concluding that the circuit court erred in convicting the defendant for attempted murder because "the evidence does not support the conclusion that [the defendant] had the intent to kill").

B. *Haywood and Crawley depended on the reasonable-hypothesis-of-innocence principle.*

The majority is wrong to undermine two of our precedents that correctly applied the reasonable-hypothesis-of-innocence principle. In *Haywood v. Commonwealth*, 20 Va. App. 562 (1995), we held that the Commonwealth failed to prove that the defendant intended to kill the police officers who parked their vehicles in the path of his fleeing car. *Id.* at 567. Because the "convictions were based solely on circumstantial evidence," we said that "all necessary circumstances proved must be consistent with guilt and inconsistent with innocence." *Id.* And while the facts supported the hypothesis that Haywood intended to hit the officers, "the Commonwealth's evidence failed to exclude another reasonable hypothesis"—that Haywood

"merely attempted to run a roadblock to avoid apprehension." *Id.* "Thus, because the Commonwealth presented no direct evidence that Haywood in running the road blocks intended to murder the police officers and because its circumstantial evidence did not exclude a reasonable hypothesis of innocence, we reverse[d] Haywood's convictions." *Id.* at 568.

While not overruling the outcome in that case, the majority insists that *Haywood*'s articulation of the reasonable-hypothesis-of-innocence principle is somehow "inconsistent with settled law." The majority cites no authority for that ipse dixit and ignores that our Supreme Court has favorably cited *Haywood*'s rationale. *See Baldwin*, 274 Va. at 280, 282.

The majority engages in a similarly unpersuasive effort to obliterate our stated reliance on the reasonable-hypothesis-of-innocence rationale in *Crawley v. Commonwealth*, 25 Va. App. 768 (1997). Crawley shot his pistol at two people, hitting Acree and narrowly missing Newman, who was standing right next to Acree. Crawley testified that he intended to shoot Acree, not Newman. We reversed Crawley's conviction for attempted malicious wounding of Newman because the Commonwealth failed to prove that he intended to shoot her, rather than Acree. *Id.* at 774. "Despite Newman's close proximity to Acree at the time of the shooting, the totality of the circumstantial evidence regarding appellant's intent failed to exclude as a reasonable hypothesis the possibility that his sole purpose when he fired his gun was to shoot Acree." *Id.* at 775.

Here again, the majority purports to preserve the result in *Crawley* while gutting its use of the reasonable-hypothesis-of-innocence principle as "erroneous dicta." But as with *Haywood*, the reasonable-hypothesis-of-innocence rationale was not dicta—it was the "*ratio decidendi*— the essential rationale in the case that determines the judgment." *Clinchfield Coal Co. v. Reed*, 40 Va. App. 69, 73-74 (2003). And the majority cites no authority for its novel claim that

- 24 -

*Crawley* and *Haywood* were wrong to rely on a bedrock principle that we and the Supreme Court have repeatedly invoked.

It is true that our Court has the power when sitting en banc to overrule prior precedent, but the majority will have to do more than kneecap the rationale of *Haywood* and *Crawley* to extirpate the reasonable-hypothesis-of-innocence principle from our jurisprudence. It would have to disavow the black-letter law applied in numerous cases since *Vasquez*. *See supra* note 8. And it would have to overrule numerous *other* cases besides *Haywood* and *Crawley* that reversed convictions because the Commonwealth's evidence failed to negate a reasonable hypothesis of innocence.[9]

### C. *The evidence here failed to negate a reasonable hypothesis of innocence.*

Fary's convictions for attempted malicious wounding should be reversed because the Commonwealth's evidence failed to exclude a reasonable hypothesis of innocence that flowed from the evidence: after Fary became enraged about the wake from the Creekmores' boat, Fary sought retribution by trying to frighten Mr. Creekmore and damage his boat. But that intent falls short of the mens rea for attempted malicious wounding—that Fary intended, not just to harm all seven people on board, but "to maim, disfigure, disable, or kill" every one of them. Code § 18.2-51.[10]

---

[9] *See, e.g.*, *Jennings*, 67 Va. App. at 628; *Dove v. Commonwealth*, 41 Va. App. 571, 579-80 (2003); *Haskins v. Commonwealth*, 31 Va. App. 145, 151-52 (1999); *Betancourt v. Commonwealth*, 26 Va. App. 363, 375 (1998); *Littlejohn v. Commonwealth*, 24 Va. App. 401, 414 (1997); *Granger v. Commonwealth*, 20 Va. App. 576, 577-78 (1995); *Pemberton v. Commonwealth*, 17 Va. App. 651, 654-55 (1994); *Williams v. Commonwealth*, 14 Va. App. 666, 669-70 (1992).

[10] The trial court never found that Fary had the specific intent to maim or kill all seven passengers. Instead, the court observed that "slam[ming]" the Creekmores' boat was "an intentional and malicious act" and that "Mr. Fary saw there were young children in that boat and still made the conscious, intentional decision that he wanted to do something *to that boat*."

As the majority acknowledges, the damage to the Creekmores' boat (pictured to the left)



was only "cosmetic, and [the boat] remained operable after the incident." The trial court made factual findings about the features of each boat. It found that Fary's boat, the "jon boat," was made of "aluminum" and had a "30-horsepower motor." In contrast, it found that the Creekmores' Sunbird was "larger" than the jon boat, made of "fiberglass," and had a "115-horsepower motor" (see below).



*Mr. Fary's (appellant) boat (above)*



*Mr. Creekmore's (victim) boat (above)*

Without any real damage or more than slight injury from Fary's actions, the majority zeros in on several facts to infer Fary's intent to maim or kill all seven passengers, but these facts are at least equally consistent with an intent to merely damage the boat: Fary was angrily yelling and cursing; he rammed his jon boat into the Sunbird "with enough force to ride up on the gunwale"; then a second time he "engaged his engine with enough power [to ride] up on the side of the Sunbird again, to a point that it reached a foot and a half above the boat gunwale, leaving paint on the hardware to the canopy and the top portion of the windshield"; and Fary did all that "with seven unrestrained passengers in plain view." But when, as here, "the facts are 'equally susceptible of two interpretations one of which is consistent with the innocence of the accused, [the trier of fact] cannot arbitrarily adopt that interpretation which incriminates [the accused]." *Jay v. Commonwealth*, 275 Va. 510, 527 (2008) (quoting *Burton v. Commonwealth*, 108 Va. 892, 899 (1908)). By failing to exclude the reasonable hypothesis of innocence, the Commonwealth failed to meet its burden to show that the factfinder did not arbitrarily choose the malevolent scenario. "Suspicion, no matter how strong, is not enough. Convictions cannot rest upon speculation and conjecture." *Littlejohn v. Commonwealth*, 24 Va. App. 401, 415 (1997).

*D.  Even apart from the "reasonable hypothesis of innocence," no reasonable factfinder could have concluded Fary had the requisite intent.*

Accepting, arguendo, the majority's doing away with the reasonable-hypothesis-of-innocence principle, we would still hold that the trial court's judgment was without evidence to support it.

To evaluate circumstantial evidence of intent in prior malicious wounding cases, our Supreme Court has looked for "circumstances of violence and brutality."  *Burkeen v. Commonwealth*, 286 Va. 255, 259 (2013) (quoting *Fletcher v. Commonwealth*, 209 Va. 636, 640 (1969)).  A factfinder must "consider not only the method by which a victim is wounded, but also the circumstances under which that injury was inflicted in determining whether there is sufficient evidence to prove intent to permanently maim, disfigure or disable a victim." *Dominguez v. Pruett*, 287 Va. 434, 444 (2014).  These circumstances have included whether the victim provoked the attack, the amount of force used, whether the hit was to a vulnerable area of the victim's body, any size disparity between the parties involved, the extent of the injury sustained, the language and taunts of the assailant, and whether the attacker would have continued the violence absent intervention by some third party.  *See Burkeen*, 286 Va. at 261; *Shackelford v. Commonwealth*, 183 Va. 423 (1945); *Dawkins v. Commonwealth*, 186 Va. 55 (1947).[11]

---

[11] Instead of considering these circumstances, the majority compares this case to ones where a car tried to run into a pedestrian, or someone on a motorcycle.  *See Holley v. Commonwealth*, 44 Va. App. 228, 237 (2004); *Stevens v. Commonwealth*, 38 Va. App. 528, 531 (2002).  In *Holley* and *Stevens*, the defendants were convicted of attempted malicious wounding for driving their vehicles at the victim under circumstances that supported the inference that the defendant intended to kill or maim the victim, not just escape.  *See Holley*, 44 Va. App. at 238 ("The evidence raises the sole inference that Holley intended to escape even if in so doing he had to drive his accelerating vehicle into the officer who stood before him."); *Stevens*, 38 Va. App. at 536 (holding that there was evidence to reject the hypothesis of innocence where the defendant had a clear escape route but instead drove his vehicle at the motorcycle officer).  An important distinction between this case and *Holley* and *Stevens* is that the defendants were charged with

Looking at these same factors here, the court found the extent of the injury to the one passenger to be "slight." The court also found a disparity in the size and strength of the boats. There is no evidence in the record as to the speed Fary was traveling when he rammed his boat into the Creekmore vessel, and the force caused "cosmetic" damage only.[12] While Fary yelled and swore before ramming into the boat, there was no evidence he made any threats of harm. According to Mr. Creekmore's testimony, after Fary hit his boat, Fary apologized and then left. Under the circumstances here, we conclude the court's finding that there was a specific intent to maim, disfigure, disable, or kill lacked any supporting evidence.

To be sure, Fary's conduct was unlawful. As the trial court observed, it was at least "reckless." But no evidence in the record elevates Fary's mens rea from recklessness to "intent

---

attempted malicious wounding for charging their targets but failing to strike them only because the targets jumped out of the way. In contrast, here, Fary charged and struck his target successfully, causing only minimal damage, both to the boat and the people on it.

The majority errs in suggesting that the victim's vulnerability alone, and the danger that *could* have resulted, are decisive on the question of intent. For instance, in *Baldwin*—a case the majority overlooks—the Supreme Court found the evidence insufficient to support attempted murder when a defendant nearly drove over the feet of the motorcycle officer who stopped him. *See* 274 Va. at 282 (reversing conviction because "this evidence does not support the conclusion that Baldwin possessed the requisite specific intent to kill"). Indeed, the Court found that case analogous to *Haywood*, one of the authorities the majority attempts to discredit here, concluding the facts "only supported the conclusion that the defendant was attempting to escape." *Id.*

[12] We note that several facts suggest that Fary was not traveling at a high rate of speed. Fary's engine was only 30-horsepower, he had a short distance (15 feet) to accelerate his boat from its neutral state, and the minor, cosmetic damage done to the Sunbird suggest that Fary was not traveling at a speed that would impact the Sunbird with much force upon collision.

to maim, disfigure, disable, or kill." Thus, we would reverse and vacate Fary's seven

convictions for attempted malicious wounding.[13]

---

[13] The majority wrongly characterizes our position as "usurping the factfinding function of the circuit court." We have not "reassigned the credibility of the witnesses" and instead take the evidence as the Commonwealth would have us believe it. Taking the evidence as such, we would hold that, as a matter of law, the elements of attempted malicious wounding are not met because there is no compelling evidence that Fary had the intent to cause the level of injury required for a malicious wounding, as opposed to merely property damage or assault and battery. *See Davis*, 150 Va. at 617 (noting that the required mens rea for assault and battery is "an intention to do bodily harm"); *id.* at 619 (noting that "[a]ssault and battery may be committed by" driving an "automobile . . . against another vehicle in which persons are riding, whereby the collision occasions bruises, blows, and similar physical injuries to persons in the vehicle so struck." (quoting *Berry on Automobiles* (4th Ed.), section 1754)).

# VIRGINIA:

*In the Court of Appeals of Virginia on* **Tuesday** *the* **20th** *day of* **September, 2022**.

Michael Melvin Fary,                                                                                    Appellant,

 against                    Record No. 1079-21-2
                               Circuit Court Nos. CR20-60(00) through CR20-60(06) and CR20-60(12)

Commonwealth of Virginia,                                                              Appellee.

Upon a Petition for Rehearing En Banc

Before the Full Court

On September 6, 2022 came the appellant, by counsel, and filed a petition requesting that the Court set aside the judgment rendered herein on August 23, 2022, and grant a rehearing *en banc* on the issue raised in the petition.

On consideration whereof and pursuant to Rule 5A:35 of the Rules of the Supreme Court of Virginia, the petition for rehearing *en banc* is granted and the appeal of those issues is reinstated on the docket of this Court. The mandate previously entered herein is stayed pending the decision of the Court *en banc*.

The parties shall file briefs in compliance with the schedule set forth in Rule 5A:35(b). The appellant shall attach as an addendum to the opening brief upon rehearing *en banc* a copy of the opinion previously rendered by the Court in this matter. An electronic version of each brief shall be filed with the Court and served on opposing counsel.[1]

A Copy,

Teste:

A. John Vollino, Clerk

By:   *original order signed by a deputy clerk of the*
      *Court of Appeals of Virginia at the direction*
      *of the Court*
                                        Deputy Clerk

---

[1] The guidelines for filing electronic briefs and appendices can be found at www.courts.state.va.us/online/vaces/resources/guidelines.pdf.

Present:   Judges Humphreys, Causey and Senior Judge Clements
Argued at Richmond, Virginia


MICHAEL MELVIN FARY

MEMORANDUM OPINION* BY
v.        Record No. 1079-21-2          JUDGE JEAN HARRISON CLEMENTS
AUGUST 23, 2022

COMMONWEALTH OF VIRGINIA


FROM THE CIRCUIT COURT OF KING WILLIAM COUNTY
Thomas B. Hoover, Judge

Devin G. Hensley (Martin, Ingles & Hensley Ltd., on brief), for
appellant.

Timothy J. Huffstutter, Assistant Attorney General (Jason S.
Miyares, Attorney General, on brief), for appellee.


Following a bench trial, the Circuit Court of King William County convicted appellant of

seven counts of attempted malicious wounding, in violation of Code §§ 18.2-26/18.2-51, and one

count of reckless operation of a boat, in violation of § 29.1-738.  The circuit court sentenced him

to a total of thirty-five years and twelve months, with twenty-one years and six months

suspended, and an active jail sentence of two years and six months with ten years of supervised

probation.  On appeal, appellant challenges the sufficiency of the evidence to support his

convictions for attempted malicious wounding.  For the following reasons, we affirm the trial

court's judgment.

BACKGROUND

"Because the Commonwealth was the prevailing party below, we 'view the record in the

light most favorable to the Commonwealth[,]' granting it any inferences that flow from that view."

---

* Pursuant to Code § 17.1-413, this opinion is not designated for publication.

*Massie v. Commonwealth*, 74 Va. App. 309, 315 (2022) (quoting *Delp v. Commonwealth*, 72 Va. App. 227, 230 (2020)).

On July 18, 2020, appellant and his girlfriend were riding on appellant's "jon boat" along the Mattaponi River to deliver fishing supplies to appellant's son. After approximately twenty minutes on the water, appellant's boat ran out of gas, causing it to stop "in the middle of the channel." The channel was "not that wide right there" and "pretty shallow on both sides" which made stopping in the middle of the channel a "safety issue," according to the conservation officer who responded to the incident in question. As appellant was switching the gas tanks on his boat, another boat approached, a seventeen-foot "seabird," carrying Douglas Creekmore, Lindsay Creekmore, (his wife), their one-and-a-half-year-old daughter, as well as their friend Gretchen Frayser and her three minor children. According to Mr. Creekmore's testimony, the Creekmores' boat "went up to the right of [appellant's] boat to try to keep as less wake as possible." As the Creekmores' boat passed appellant's boat, Mr. Creekmore watched "[appellant's] boat rock," and he continued driving the boat onward, thinking "everything [was] fine."

Moments later, Mr. Creekmore looked back and saw appellant's boat following him as they made their way downriver. Mr. Creekmore then turned his boat around and headed towards a dock at Rainbow Acres, hoping that appellant at that point "would quit following [them]." Appellant's boat proceeded to turn around as well and continued following the Creekmores' boat to the dock. According to Mr. Creekmore's testimony, upon arriving at the dock, appellant "came up behind us and said, "You fucking wanna [sic] swamp me?" Mr. Creekmore testified that appellant continued cursing at him and proceeded to drive his boat directly into the back stern of the Creekmores' boat. According to Mr. Creekmore, as everyone in the Creekmores' boat was "screaming," appellant drove his boat again into the Creekmores' boat, this time "near where the driver's seat is." The beachmaster at Rainbow Acres, who was present at the time, also testified that he observed

appellant's boat "slam into" the Creekmores' boat, "back off, and slam into it a second time." The beachmaster testified that the "yelling match" continued. According to Mr. Creekmore, after he turned around once again and looked at appellant, appellant "[threw] up his hands," apologized, and went back upriver.

At that point, Mr. Creekmore noticed that appellant's boat had "nudged" the head of Ms. Frayser's youngest son, six years old at the time, who was sitting in the backseat of the boat. According to Ms. Frayser, appellant's boat made contact with the child's head during the first collision. The child complained that "his head hurt" and he had a "goose egg on his head," but there were no signs of a concussion. The conservation officer also examined the child and found no open wound or bleeding. The officer did note, however, a knot above the child's right ear. The Creekmores' boat remained operational, and the damages were "cosmetic," amounting to approximately $500 in repairs.

The responding conservation officer obtained appellant's boat registration number and visited appellant's residence on record. Upon arrival, the officer spoke with appellant who indicated "that he knew why [the officer] was there." During the meeting, appellant informed the officer that while his boat "was adrift in the channel . . . [another] boat came around the bend at a high rate of speed. . . . [H]e was worried that it was going to wash his boat or swamp his vessel. He stated at that point he initiated his till steer engine and began to follow the boat downriver." According to the officer, appellant was "pissed off." Appellant informed the officer that he "bumped the boat" after following it to the dock at Rainbow Acres, and "got into a verbal confrontation" with the passengers of the boat. Appellant did not inform the officer that he collided with the Creekmores' boat a second time.

At the conclusion of the Commonwealth's evidence, appellant moved to strike the Commonwealth's case pertaining to the attempted malicious wounding charges, arguing that there

- 3 -

was no evidence demonstrating appellant had the requisite "intent to cause grievous or bodily injury or maiming." The trial court overruled the motion to strike, finding that the Commonwealth had presented sufficient evidence to move forward with the charges.

Appellant then presented testimony of his girlfriend, Carol Messler, who was with appellant on his boat during the incident. Ms. Messler testified that while appellant's boat was stopped in the middle of the channel, the Creekmores' boat came "very, very close, and they didn't slow down. [She] waved [her] arms. They had to have been within 8 feet, 10 feet of [appellant's boat], enough that it rocked the boat pretty good. . . . [T]hey just kept right on going." According to Ms. Messler, appellant was "upset," but not angry.

Ms. Messler denied that she and appellant intended to follow the Creekmores' boat initially, stating that they "had to go downriver anyway, because that's where [they] put the boat down in at." However, when the Creekmores' boat turned around towards Rainbow Acres, she and appellant saw the Creekmores again and felt the need "to talk to them because [of their] dangerous boating." Ms. Messler testified that, when appellant's boat reached the dock at Rainbow Acres, the Creekmores' boat "had stopped at the end of the dock, and we thought they were gonna [sic] continue. And [appellant] was trying to slow the boat down, and we caught into the side. There was nowhere to turn to avoid it." Ms. Messler did not recall appellant cursing at the Creekmores during the confrontation.

Appellant testified that after the Creekmores' boat passed his boat within eight to ten feet, he "continued on behind them, but they were . . . a good ways in front of [him]." When he saw that they had turned around en route to Rainbow Acres, appellant reversed course as well so he could "talk to them." According to appellant, as his boat approached the dock, he intended to "swing around behind them . . . to wake him the way he did me." Appellant acknowledged that he

previously saw young children in the Creekmores' boat without life preservers and confirmed his understanding that waking the Creekmores' boat could have caused the children to fall off the boat.

According to appellant, when he arrived at the dock, he attempted to "let off the gas, and the wake behind me was shoving me that way, and I couldn't stop." Appellant testified that his boat then "hit the pole to try to . . . stop from hitting the boat." When his boat made contact with and "rode up on" the other boat, appellant attempted to "throw it in reverse," but "the motor had locked down [and] . . . revved up out the water." At that point, according to appellant, one of the girls in the Creekmores' boat was able to push the boats away from each other. Appellant testified that he then "reached back to try to . . . put the motor back, [and] it went all the way back forward and [his boat] rode up on them again." Appellant stated that he and Mr. Creekmore continued "yelling back and forth at each other." Eventually, according to appellant, they apologized to each other and appellant regained control of the motor and drove his boat back upriver.

After hearing the arguments of the parties, the trial court convicted appellant of all seven counts of attempted malicious wounding and one count of reckless operation of a boat.[1] This appeal followed.

ANALYSIS

Appellant argues that there was insufficient evidence to establish that he had "the specific intent to maliciously wound anyone when his boat came into contact with the victims' boat." According to appellant, the evidence demonstrates, at most, that he intended "to confront Mr. Creekmore about being swamped and wanted to cause a wake to hit against the Creekmores' boat." Appellant maintains that the collisions occurred due to his boat's engine "stall[ing] out" and that he did not have control of his boat at the time of the collisions. He emphasizes that the contact

---

[1] The trial court found appellant not guilty of leaving the scene of a boating accident with property damage and dismissed that charge.

between the boats "was minimal" and that the Creekmores' boat incurred only cosmetic damage. While appellant admits that his actions were "reckless," he argues that recklessness "is not the specific intent required to convict [him] of seven counts of attempted maiming."

"When reviewing the sufficiency of the evidence, '[t]he judgment of the trial court is presumed correct and will not be disturbed unless it is plainly wrong or without evidence to support it.'" *McGowan v. Commonwealth*, 72 Va. App. 513, 521 (2020) (alteration in original) (quoting *Smith v. Commonwealth*, 296 Va. 450, 460 (2018)). "In such cases, '[t]he Court does not ask itself whether *it* believes that the evidence at the trial established guilt beyond a reasonable doubt.'" *Id.* (alteration in original) (quoting *Secret v. Commonwealth*, 296 Va. 204, 228 (2018)). "Rather, the relevant question is whether '*any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.'" *Vasquez v. Commonwealth*, 291 Va. 232, 248 (2016) (quoting *Williams v. Commonwealth*, 278 Va. 190, 193 (2009)). "If there is evidentiary support for the conviction, 'the reviewing court is not permitted to substitute its own judgment, even if its opinion might differ from the conclusions reached by the finder of fact at the trial.'" *McGowan*, 72 Va. App. at 521 (quoting *Chavez v. Commonwealth*, 69 Va. App. 149, 161 (2018)).

It is a crime to "maliciously shoot, stab, cut, or wound any person or by any means cause him bodily injury, with the intent to maim, disfigure, disable, or kill[.]" Code § 18.2-51. "An attempt to commit a crime is composed of two elements: (1) The intent to commit it; and (2) a direct, ineffectual act done towards its commission." *Fletcher v. Commonwealth*, 72 Va. App. 493, 506 (2020) (quoting *Haywood v. Commonwealth*, 20 Va. App. 562, 565 (1995)). "Because intent is a 'state of mind,' it 'may be proved by a person's conduct or by his statements.'" *Id.* (quoting *Barrett v. Commonwealth*, 210 Va. 153, 156 (1969)). "The 'intent to commit malicious wounding' is the intent to 'maliciously shoot, stab, cut or wound any person or by any means

cause bodily injury with the intent to maim, disfigure, disable or kill[.]'" *Id.* at 507 (quoting Code § 18.2-51).

"The presence of malice 'is a question of fact to be determined by [the trier of fact].'" *Id.* (quoting *Long v. Commonwealth*, 8 Va. App. 194, 198 (1989)). "Malice is evidenced either when the accused acted with a sedate, deliberate mind, and formed design, or committed any purposeful and cruel act without any or without great provocation." *Id.* (quoting *Branch v. Commonwealth*, 14 Va. App. 836, 841 (1992)). "Malice may be inferred from the 'deliberate use of a deadly weapon[.]'" *Id.* (quoting *Strickler v. Commonwealth*, 241 Va. 482, 495 (1991)).

The trial court emphasized the beachmaster's testimony regarding his observations of the incident. Specifically, the beachmaster observed appellant and Mr. Creekmore yelling at each other and appellant's boat "slam[ming] into the larger boat, back[ing] off, and slam[ming] a second time." The trial court also emphasized the evidence indicating that the collisions were "large enough that [appellant's boat] rode up [on Mr. Creekmore's boat]." The trial court did not accept appellant's account regarding the impact of the collisions. The trial court also did not accept the testimony of appellant's girlfriend as credible and found that the evidence established that appellant was "angry and upset" at the time of the incident and committed an "intentional and malicious act" when he drove his boat twice into the Creekmores' boat.

"[T]he credibility of a witness, the weight accorded the testimony, and the inferences to be drawn from proven facts are matters solely for the fact finder's determination." *Fletcher*, 72 Va. App. at 502 (quoting *Crawley v. Commonwealth*, 29 Va. App. 372, 375 (1999)). "In its role of judging witness credibility, the fact finder is entitled to disbelieve the self-serving testimony of the accused and to conclude that the accused is lying to conceal his guilt." *Flanagan v. Commonwealth*, 58 Va. App. 681, 702 (2011) (quoting *Marable v. Commonwealth*, 27 Va. App. 505, 509-10 (1998)); *see also Hall v. Commonwealth*, 69 Va. App. 437, 449-50 (2018). "When

- 7 -

'credibility issues have been resolved by the [fact finder] in favor of the Commonwealth, those findings will not be disturbed on appeal unless plainly wrong.'" *Towler v. Commonwealth*, 59 Va. App. 284, 291 (2011) (quoting *Corvin v. Commonwealth*, 13 Va. App. 296, 299 (1991)). The appellate court "faced with a record of historical facts that supports conflicting inferences must presume—even if it does not affirmatively appear in the record—that the trier of fact resolved any such conflicts in favor of the prosecution, and must defer to that resolution." *Wright v. West*, 505 U.S. 277, 296-97 (1992) (quoting *Jackson v. Virginia*, 443 U.S. 307, 326 (1979)).

Here, the trial court permissibly rejected the testimony of appellant and appellant's girlfriend and based its findings regarding appellant's intent on the totality of the evidence. Accordingly, the trial court did not err by convicting appellant of seven counts of attempted malicious wounding.

## CONCLUSION

For the foregoing reasons, the circuit court's judgment is affirmed.

*Affirmed*.

Causey, J., dissenting.

Appellant did not have the mens rea required for seven counts of attempted malicious wounding, in violation of Code §§ 18.2-51 and 18.2-26.  Thus, I respectfully dissent from the majority affirmance of appellant's convictions.

When considering a challenge to the sufficiency of the evidence supporting a conviction, an appellate court reviews the facts "in the light most favorable to the Commonwealth, the prevailing party at trial."  *Gerald v. Commonwealth*, 295 Va. 469, 472 (2018) (quoting *Scott v. Commonwealth*, 292 Va. 380, 381 (2016)).  After reviewing the evidence in the light most favorable to the Commonwealth, the court must ask whether "any rational trier of fact would have found the essential elements of the crime beyond a reasonable doubt."  *Maldonado v. Commonwealth*, 70 Va. App. 554, 562 (2019).  Here, even viewing the evidence in this light, the Commonwealth has not proved that the appellant had the specific intent to maliciously wound the passengers on the Creekmores' boat.  Thus, it has failed to prove an essential element of the offense beyond a reasonable doubt.

The malicious wounding statute states that it is a crime to "maliciously shoot, stab, cut, or wound any person or by any means cause him bodily injury, with the intent to maim, disfigure, disable, or kill[.]"  Code § 18.2-51.  Moreover, an "attempt" is "an apparent unfinished crime," and contains "two elements, viz:  (1) The intent to commit a crime; and (2) a direct act done towards its commission, but falling short of the execution of the ultimate design."  *Sizemore v. Commonwealth*, 218 Va. 980, 983 (1978) (quoting *Glover v. Commonwealth*, 86 Va. 382, 385-86 (1889)).  At issue here is the first element, the intent to commit a crime.

"The intent required to be proven in an attempted crime is the *specific intent* in the person's mind to commit the particular crime for which the attempt is charged."  *Wynn v. Commonwealth*, 5 Va. App. 283, 292 (1987) (emphasis added); *see Merritt v. Commonwealth*,

- 9 -

164 Va. 653, 660 (1935) ("[W]hile a person may be guilty of murder though there was no actual intent to kill, he cannot be guilty of an attempt to commit murder unless he has a specific intent to kill."). Moreover, the substantive offense, here, malicious wounding, requires "that the accused ha[ve] the *specific intent* to 'maim, disfigure, disable or kill' the victim of the attack."[2] *Commonwealth v. Vaughn*, 263 Va. 31, 35 (2002) (emphasis added). Therefore, the mens rea required for an attempted malicious wounding offense is the specific intent to "'maim, disfigure, disable or kill' the victim of the attack." *Id.* Recklessness is not sufficient to meet the requisite mens rea for crimes of attempt. *See Haywood v. Commonwealth*, 20 Va. App. 562, 566 (1995) (highlighting the distinction between reckless actions and crimes of specific intent in reversing the appellant's conviction for attempted capital murder of a police officer).

"Th[e] specific intent at the time the act is done is essential. To do an act from general malevolence is not an attempt to commit a crime, because there is no specific intent, though the act according to its consequences *may* amount to a substantive crime." *Thacker v. Commonwealth*, 134 Va. 767, 770 (1922) (emphasis added). Regarding crimes of attempt, the Court in *Haywood* explained that "[w]hen we say that a man attempted to do a given wrong, we mean that he intended to do it specifically; and proceeded a certain way in the doing. The intent in the mind covers the thing in full; the act covers it only in part." 20 Va. App. at 566. "The test of the offense of maliciously or unlawfully causing bodily injury *is the intent with which the result is accomplished rather than the nature of the means*, where the means are specified and established." *Dawkins v. Commonwealth*, 186 Va. 55, 63 (1947) (emphasis added). "Thus, *the*

---

[2] The word "maim" means a permanent and not merely a temporary and inconsequential disfigurement. 56 C.J.S. *Mayhem* § 11 (2022 Update). Additionally, the word "disfigure" also means permanent and not merely temporary and inconsequential disfigurement. Similarly, "disable" refers to permanent, not temporary, disablement. *See Campbell v. Commonwealth*, 12 Va. App. 476, 484 (1991) (en banc).

*failure to prove an intent to wound* is fatal in a trial for attempted malicious wounding." 1 Va. Crim. Law & Proc. § 18.4 (2022) (emphasis added).

For example, in *Small v. Commonwealth*, No. 1511-08-3, 2009 WL 4791805, at *6 (Va. Ct. App. Dec. 15, 2009), the Court held that there was no specific intent to maliciously wound when the defendant bent the victim's fingers back, scratched her, and stepped on her foot, but only intended to do no more than scare the victim. In contrast, in *Slusher v. Commonwealth*, 196 Va. 440, 446 (1954), the Court held that there was specific intent to maliciously wound when the defendant verbally and continuously threatened to kill the victim while holding him at knifepoint, and his action was unprovoked and without excuse. As these cases show, while "a person is presumed to intend the immediate, direct, and necessary consequences of his voluntary act," the court must also examine the appellant's specific intent at the time of the incident, not simply the possible consequences of the appellant's actions. *Nobles v. Commonwealth*, 218 Va. 548, 551 (1977); *see Merritt*, 164 Va. at 661; *compare Moody v. Commonwealth*, 28 Va. App. 702, 707 (1998) (holding the appellant had specific intent when he deliberately chose to accelerate into the pedestrian, never decelerating, or swerving to avoid the pedestrian), *with Haywood*, 20 Va. App. at 568 (holding it would be unreasonable to infer that the direct consequence of appellant running through two roadblocks while being pursued by the police would have been injury or death).

Additionally, to support a finding of malicious wounding, "a person must intend to permanently, not merely temporarily, harm another person." *Burkeen v. Commonwealth*, 286 Va. 255, 259 (2013). Moreover, "[a]n intent to maim or disfigure cannot be presumed from an act which does not naturally bespeak such intent." *Banovitch v. Commonwealth*, 196 Va. 210, 217 (1954).

- 11 -

The majority notes that the trial court correctly found that the appellant acted with the requisite intent, referencing the trial court's findings "that appellant was 'angry and upset' at the time of the incident" and that appellant "committed an 'intentional and malicious act' when he drove his boat twice into the Creekmores' boat." However, these facts, in conjunction with the other facts favoring the Commonwealth, are not enough to prove that, in angrily and intentionally driving his boat into the Creekmores' boat, appellant had the specific intent to maim, disfigure, disable, kill, or otherwise permanently harm any of the occupants of the Creekmores' boat. The Creekmores conceded that there was only minor damage to their boat (see below) and that appellant's boat was "creeping forward" in neutral but was not in gear at the time of contact.



Additionally, the Creekmores conceded that appellant "backed his motor off" when approaching their boat. Mr. Creekmore also noted that they did not observe appellant take any

action to propel his jon boat into Mr. Creekmore's boat. Also, significantly, as the Commonwealth's exhibits show, appellant was driving a jon boat with a 30-horsepower motor which is smaller in size than the Creekmores' boat with a 115-horsepower motor.



Mr. Creekmore's (victim) boat (above)



Mr. Fary's (appellant) boat (above)

The disparity in the size of the boats shows that, because it is unlikely that appellant could have seriously injured a person on the Creekmores' boat, appellant likely thought his boat would not injure anyone, and thus appellant likely did not have the specific intent to commit malicious wounding. The trial court also never found, nor do the facts indicate, that appellant had the intent of using his boat to hit anything other than the Creekmores' boat. This case is more like *Small* than *Slusher*, discussed above.

Appellant "confirmed his understanding that waking the Creekmores' boat could have caused the children to fall off the boat." Children falling off the boat, into the water, however, is not the type of injury contemplated by the malicious wounding statute.[3] The facts also do not show that appellant specifically intended for children to fall off the boat and drown. Additionally, though a child aboard the Creekmores' boat had a goose-egg on his/her head after the altercation, this injury is not enough to prove any specific intent to maim, disfigure, disable or kill. In fact, the minor nature of the injury is evidence that appellant did not intend for his actions to permanently harm anyone. *See Campbell v. Commonwealth*, 12 Va. App. 476, 483 (1991) (en banc) ("The nature and extent of the bodily injury and the means by which accomplished may reflect [the] intent [to maim, disfigure, disable or kill] but are not exclusive factors.").

Appellant concedes that his actions were reckless. As the Court in *Haywood* explained, however, the question in this case is not whether the appellant's actions might have resulted in a malicious wounding, but whether the appellant, when driving his boat, formed the specific intent to use his boat to maim, disfigure, disable, or kill any of the occupants of the Creekmores' boat.

Based on the facts here, no rational trier of fact could conclude that the appellant wished to maliciously wound anyone on the Creekmores' boat. At the least, appellant acted recklessly, and if he acted intentionally, his actions only demonstrate an intent for the boats to collide with each other. Because the evidence does not show specific intent to maim, disfigure, disable, kill, or otherwise permanently harm the people on the Creekmores' boat, the evidence is insufficient to uphold the seven attempted malicious wounding convictions. I would reverse and vacate the appellant's convictions.

For the reasons stated above, I respectfully dissent.

---

[3] *See supra* note 2.