# Staunton

BILLY JOE BARRETT v. COMMONWEALTH OF VIRGINIA.

September 5, 1969.

Record No. 7074.

Present, All the Justices.

*Carl C. Gillespie,* for plaintiff in error.

*Anthony F. Troy, Assistant Attorney General (Robert Y. Button, Attorney General,* on brief), for defendant in error.

BUCHANAN, J., delivered the opinion of the court.

Defendant, Billy Joe Barrett, was indicted for the rape of his twelve-year-old daughter, Daisy. On his trial to a jury the court struck out the evidence on the charge of rape, the jury found him guilty of attempt to rape and fixed his punishment at five years in the penitentiary, Code § 18.1-16. He was sentenced accordingly and is here on a writ of error. He asserts that the evidence was not suffi-

cient to prove him guilty of such attempt. It consisted essentially of the testimony of his wife and daughter.

The Barrett family was composed of the defendant, his wife Eva, to whom he had been married for nearly thirteen years, and three children—Daisy, twelve years old; Virginia, eight, and Larry, six. They lived in Burkes Garden, in Tazewell County. Defendant was employed by the County School Board to drive the school bus, and he worked on a farm between times. He and his wife Eva were custodians of the Burkes Garden school building and she cleaned the building. They lived a short distance from the school in a two-story house. The defendant and his wife slept in a room downstairs; Larry, the son, in a connecting room, and the two girls in a room upstairs.

On Saturday night, April 13, 1968, there was a dance in the school building and all the Barrett family attended. During the evening the defendant "got drunk," as his wife described it, and an officer required him to leave. The family went with him and when they reached home Mrs. Barrett sent the three children to bed. It was then about eleven o'clock.

Shortly after the family arrived home, defendant sent his wife back to the school to lock the building after the dance. She returned to the house a few minutes after midnight and as she got out of her automobile she heard Daisy "hollering pretty loud." Mrs. Barrett ran to the house. No lights were on, but the television set in the living room was operating, its volume turned down "real low."

Mrs. Barrett turned a light on and found Daisy in her parents' bed "sort of covered up and my husband was up over her." Defendant was "pretty near naked" with his "britches" down around his legs. He never wore underwear. Daisy's gown was "pulled up, sort of" above her waist.

Defendant raised up when his wife entered the room and, she testified, he "told me it wasn't what I thought it was. He thought that was Larry that he had got in the bed with and he was going to play with him some." Defendant and Larry frequently scuffled and wrestled, "pretending like they were scrapping."

Defendant's nose was bleeding and Daisy had a fleck of blood, but no apparent wound, in her ear. When Mrs. Barrett turned on the light she saw that Barrett, her husband, did not have an erection.

Daisy gave this version of what occurred after the family returned home from the dance:

She and her sister went upstairs to their bedroom but Larry stayed in the living room to watch television. After her mother left the

house to go to the school, Daisy called downstairs and asked her father's permission to come down to watch television, but he "told me, no, to stay upstairs and go on to sleep." She then "slipped" downstairs and got into her parents' bed to watch television through the door opening into the living room. When her father reduced the volume of the television set she was unable to hear so "I covered up and went to sleep." She did not know how long she slept.

She awoke when her father came into the bedroom and, she said, "he thought I was my little brother and he got me by the arms and he said, 'I got you, you little rascal you.'" Then her father hit her on the leg and told her to get back upstairs. She started screaming, she said, because she was afraid he might "whip" her for being in his bed.

She testified that when her mother came in her father was getting in the bed and as he grabbed her his "britches" fell down but she could not see his body.

After the incident Mrs. Barrett, who was mad at her husband "because he was drunk," took Daisy to the home of a neighbor and called the police. When police officers arrived, Mrs. Barrett made a complaint and defendant was arrested. Daisy made no statement to the officers. She appeared dazed and to have been crying, and she had a bruise on her left cheek. Later that night Daisy was examined by a physician but no evidence of his findings was introduced.

Mrs. Barrett was asked whether she had told her husband after he was put in jail that she was considering a divorce. She answered, "Yes, before I found out that he hadn't done that. I told him * * I wasn't going to live with him. I wanted my divorce." Later he wrote her a letter, she said, asking her to assure Daisy she would not be punished regardless of what she said, and then to ask her to tell the truth. She did so and then Daisy told her she had made this story up.

When Mrs. Barrett was being questioned by the Commonwealth's attorney she stated to the court: "Your Honor, I don't want to say anything else against my husband because since I have swore out this warrant, I found out these things wasn't so." She was directed to answer the questions.

Afterwards the Commonwealth's attorney asked Daisy whether on the night of the incident she told her mother the truth about what happened. She replied that she "made up a lie," but after her mother talked to her she decided to tell the truth. She was asked where she

had heard about the things she put in the lie and she replied that "I have a girl friend in school and she talks about stuff like that to me."

An attempt to commit a crime is composed of two elements: (1) the intent to commit it; and (2) a direct, ineffectual act done toward its commission. The act must reach far enough towards the accomplishment of the desired result to amount to the commencement of the consummation, *Ingram* v. *Commonwealth*, 192 Va. 794, 802, 66 S.E.2d 846, 851; *Preddy* v. *Commonwealth*, 184 Va. 765, 775-6, 36 S.E.2d 549, 553; *Mullins* v. *Commonwealth*, 174 Va. 477, 478-9, 5 S.E.2d 491, 492.

Intent is the purpose formed in a person's mind and may be, and frequently is, shown by circumstances. It is a state of mind which may be proved by a person's conduct or by his statements. *Johnson* v. *Commonwealth*, 209 Va. 291, 295, 163 S.E.2d 570, 574; *Howard* v. *Commonwealth*, 207 Va. 222, 228, 148 S.E.2d 800, 804.

The inferences to be drawn from proved facts are within the province of the jury, or of the court trying the case without a jury, so long as the inferences are reasonable and justified. But the inference of guilt must meet the test stated in *Webb* v. *Commonwealth*, 204 Va. 24, 34, 129 S.E.2d 22, 29: "All necessary circumstances proved must be consistent with guilt and inconsistent with innocence. It is not sufficient that the evidence create a suspicion of guilt, however strong, or even a probability of guilt, but must exclude every reasonable hypothesis save that of guilt." See also *Garner* v. *Commonwealth*, 186 Va. 600, 613, 43 S.E.2d 911, 917.

We hold that the evidence in this case does not meet these requirements.

The offense charged is revolting, unnatural and contrary to the instincts of a normal father. For the thirteen years of their marriage this defendant and his wife had experienced a normal sex life. His explanation of his purpose was not incredible, but had some support in his custom of playing with his small son.

The conditions described by Mrs. Barrett when she turned on the light were not necessarily incriminating. His physical condition in fact gave some indication that rape of his child was not defendant's purpose. There was no evidence that he had pulled up his daughter's gown, nor was there testimony that Larry was still in the living room at the time of the incident. The evidence was that the defendant had refused Daisy's request to be allowed to come back downstairs and

had told her to go on to sleep. There was no evidence that he knew that she had disobeyed and that she, not Larry, was in his bed.

The judgment below is reversed and the case is remanded for a new trial if the Commonwealth be so advised.

*Reversed and remanded.*