COURT OF APPEALS OF VIRGINIA

UNPUBLISHED

Present:   Judges Chaney, Callins and White
Argued at Alexandria, Virginia


KEVIN EUGENE BROOKS

                                                    MEMORANDUM OPINION* BY
v.        Record No. 0232-23-4            JUDGE DOMINIQUE A. CALLINS
                                                         JANUARY 9, 2024
COMMONWEALTH OF VIRGINIA


FROM THE CIRCUIT COURT OF CULPEPER COUNTY
Dale B. Durrer, Judge

Angela H. Williams (HarperWilliams, PLLC, on brief), for
appellant.

David A. Stock, Assistant Attorney General (Jason S. Miyares,
Attorney General, on brief), for appellee.


Following a bench trial, Kevin Eugene Brooks appeals his conviction for malicious

wounding in violation of Code § 18.2-51.  Brooks asserts that the evidence failed to prove that he

possessed the intent to maim, disfigure, disable, or kill the victim and that he acted with malice.

We disagree with Brooks and affirm the judgment of the trial court.

---

* This opinion is not designated for publication.  *See* Code § 17.1-413(A).

BACKGROUND[1]

R.R.[2] and Brooks were romantic partners for thirteen years and had children in common. On December 15, 2021, Brooks and R.R. had been drinking alcohol heavily. R.R. admitted that she had approximately eight two-ounce shots of vodka and fell asleep on the living room couch. When R.R. woke up, Brooks was on top of her. On rebuttal, R.R. asserted that Brooks became angry when she refused his sexual advances. R.R. "freaked out," got up, and locked herself in the bathroom, where she remained for an hour. Although at first she just sat down and waited for Brooks to go to bed, she eventually decided to take a bath.

Sometime after R.R. entered the bathtub, Brooks forced his way into the bathroom, and proceeded to hit R.R. multiple times on the head. R.R. testified specifically that Brooks hit her on "[t]he entirety of the top of [her] skull, the sides, [her] nose." R.R. escaped the bathroom and Brooks followed her down the hallway. Once in the kitchen, Brooks pushed R.R. against the washer and hit her in the face.[3] At some point, R.R. grabbed a knife to defend herself from Brooks and "slash[ed]" at Brooks to keep him away. R.R. believed that she cut Brooks with the knife but was unsure where she cut him. In the kitchen, R.R. fell onto her hands and knees on the floor.

---

[1] On appeal, "we review the evidence in the 'light most favorable' to the Commonwealth." *Clanton v. Commonwealth*, 53 Va. App. 561, 564 (2009) (en banc) (quoting *Commonwealth v. Hudson*, 265 Va. 505, 514 (2003)). That principle requires us to "discard the evidence of the accused in conflict with that of the Commonwealth, and regard as true all the credible evidence favorable to the Commonwealth and all fair inferences that may be drawn therefrom." *Kelly v. Commonwealth*, 41 Va. App. 250, 254 (2003) (en banc) (quoting *Watkins v. Commonwealth*, 26 Va. App. 335, 348 (1998)).

[2] We use initials instead of the victim's name to protect her privacy. *See Poole v. Commonwealth*, 73 Va. App. 357, 360 n.1 (2021).

[3] R.R. clarified that, because "[e]verything happened really quickly and after being . . . hi[t] in the head multiple times," she did not "want to say it's . . . 100%," but was nevertheless "pretty sure [Brooks] hit [her] in the face with his hands once [they] were in the kitchen." She also stated that she "believe[d]" Brooks "used his hands while he was hitting [her] in the head" in the bathroom.

When Brooks got on top of her, the dogs, who were protective of Brooks, started to bite R.R.'s right arm. R.R. freed herself and ran outside. R.R. testified that her scalp was split open, her nose was broken, and she had multiple wounds on her arms. She acknowledged that the wounds on her arms were from the dogs.

A friend who was outside their home took R.R. to a nearby gas station; R.R. asked the attendant for a phone to call 911. R.R. could not remember if she or the attendant called 911. At trial, the Commonwealth played the 911 call for the trial court. R.R. stated on the call that she did not know what happened; that she and Brooks had been drinking, and that he began "beating the top of [her] head," after which she ran into the kitchen and attempted to defend herself. R.R. did not remember anything that occurred after the ambulance arrived until she woke up in the hospital the following day. At trial, R.R. testified that, when speaking with the 911 operator, she was scared and anxious and that she did not want Brooks to be in trouble.

R.R. admitted that she and Brooks often drank heavily together and that sometimes they argued when intoxicated. R.R. further admitted that she and Brooks had physical altercations when they drank together. A year prior, R.R. was convicted of assault after assaulting Brooks with a knife.

Donna Lee Rose testified that on December 15, she was working at the Stop In Exxon when R.R. came into the store with "blood all over her face, her hands, and a lot in her head." "There was an open gash in her—in the top of—the side of her head there." R.R. asked Rose to use the phone. Rose, seeing the blood on R.R.'s hands, called 911 for R.R. Rose noted that R.R. appeared "very shaken," that R.R.'s "hands were trembling," and that she was crying.

While R.R. talked to the 911 operator, Rose overheard R.R. state that she had been drinking with Brooks. R.R. said that she went into the bathroom and "something had switched." R.R. said

that when she came out of the bathroom, Brooks choked and hit her. R.R. managed to break free and run to the kitchen where she grabbed a knife.

Culpeper County Sheriff's Sergeant Mawdsley came to the Stop In Exxon Station in response to a reported "domestic dispute with weapon." Upon arrival, Sergeant Mawdsley saw R.R. sitting on the curb with Rose. R.R. appeared upset, and her "face, hands, and the top of her head w[ere] completely covered in blood." Sergeant Mawdsley testified that R.R. appeared confused and "dazed." After observing R.R.'s injuries, Sergeant Mawdsley called for an ambulance. The Commonwealth introduced photographs of R.R.'s injuries.

Dr. Brittany Johnson testified that she was working as an emergency department physician at Culpeper Hospital on December 15 when R.R. appeared with a four-centimeter laceration to her scalp with contused tissue. Dr. Johnson cleaned the wound and closed the laceration with four staples. Dr. Johnson took images of R.R.'s head and neck and noted a possible nasal bone fracture. R.R.'s medical records were admitted without objection.

R.R.'s medical records indicate that she talked to a social worker the day after the incident. R.R. told the social worker that she was relaxing in the tub when Brooks came into the bathroom and started to beat her. R.R. went to the kitchen to retrieve clothing, and Brooks followed. R.R. was able to escape and thought a friend took her to a phone to call 911. However, R.R. also stated to the social worker that she "ha[d] no memory of what happened, if there was a fight or how much she drank." R.R.'s discharge paperwork stated that she had a "Concussion/head injury," "Scalp laceration," and "Fractures-Nasal."

Sergeant Mawdsley went to the residence Brooks and R.R. shared to further investigate the matter. Deputies attempted to call Brooks's cell phone but Brooks did not answer. After Sergeant Mawdsley looked through a window and observed Brooks asleep on the couch, he knocked on the door to wake Brooks. Eventually, Brooks came outside to speak with the deputies.

Sergeant Mawdsley observed that Brooks had an injury underneath his left eye, and what appeared to be a bloodstain on his sweatpants near his right knee. Sergeant Mawdsley saw no other injuries. After Brooks claimed that R.R. "came at him" with "two razor knives," Sergeant Mawdsley scanned Brooks for additional injuries on his "chest-area" and saw none. Brooks told Sergeant Mawdsley that the incident started when R.R. went to the bathroom to smoke a cigarette. Because she was in the bathroom for some time, Brooks said, he opened the door and saw R.R. sitting in water in the bathtub. They began arguing. Photographs of Brooks's appearance that evening were admitted into evidence at trial.

Testifying in his own defense, Brooks claimed that he and R.R. began drinking alcohol in the afternoon of December 15, 2021, and that R.R. eventually "passed out" on the couch. Brooks woke R.R. and insisted that she go to the bathroom to relieve herself. Brooks explained that he woke R.R. so that she would not urinate on the couch, which she usually did when she fell asleep after drinking heavily. Brooks claimed that he and R.R. usually drank heavily every other day.

Brooks said that he began to worry when R.R. did not return from the bathroom for 30 to 45 minutes. He received no response to a knock on the bathroom door. Brooks ultimately used a coat hanger to open the locked door; he wanted to ensure that R.R. "was all right."

Brooks testified that he found R.R. sitting on the closed toilet seat unconscious with her pants down. He tried to wake her up but R.R. was unresponsive. Brooks moved R.R. from the toilet and attempted to pull up her pants but she fell into the hallway. Not wanting their children to see R.R. half-naked in the hallway, Brooks went to retrieve a cover for R.R. Upon his return, Brooks found that R.R. had crawled back into the bathroom and shut the door.

Brooks said that he believed the fall helped sober R.R. up, so he returned to the couch and watched more television. Brooks said that he later found R.R. completely unresponsive "in the

bathtub with her knees up, her head back, and the water was almost coming over the side of the bathtub." Brooks quickly turned the tap off and drained the water.

While waiting for the tub to drain, Brooks sat on the closed toilet seat; he admitted that he became angry when he discovered the seat was covered in urine. As he wrestled R.R. out of the tub, she "elbowed [him] in the face and out of reflex [Brooks] smacked [R.R.] a couple of times" before he "caught" himself and stopped. Brooks explained that he was frustrated with R.R. becoming belligerently intoxicated and that he did not want their children to see her in this state. Unable to move R.R., Brooks testified that he left her in the bathtub.

Five to ten minutes later, Brooks heard R.R. exit the bathtub. R.R. emerged from the kitchen into the living room, clothed, and with a long paring knife. According to Brooks, R.R. suddenly lunged at him with the knife. He blocked her thrust with his arm which sent the knife sailing to the floor. R.R. reentered the kitchen and returned with two more knives. One of the knives had a rounded edge and was dull, but the other was very sharp. Brooks backed away but R.R. advanced swinging the sharp knife. Brooks said that R.R. tripped over the coffee table and landed face-first on the couch. Brooks jumped on R.R.'s back and held her hands down. R.R. bit his hand holding her knife hand and then turned around and bit his chest. As Brooks rolled off the couch, R.R. got up. Brooks asserted that R.R. could have cut him under his left eye at that time.

Brooks tried to back up but tripped over one of the dogs. R.R. advanced towards Brooks again but "smack[ed] her face" into the door jam. Brooks "tried to kick [R.R.] in the hip to spin her around." R.R. lost her balance and fell headlong into Brooks's studio equipment. Brooks explained that his studio equipment was composed of "speakers, amplifiers, a big mixing board, . . . computer cases, desktop computers," and miscellaneous things including picture frames with

broken glass, and stacks of paper. He noted that "[t]he computers are made out of sheet metal, and they are very sharp."

While R.R. was on the ground the dogs held her down; Brooks picked up the knife R.R. dropped and went outside to tell his friend what happened and to "let [the friend] know if he didn't want to be involved to leave." When Brooks returned inside, he found R.R. packing her backpack. Brooks testified that he then told R.R. to leave so that they could "cool off."

Brooks claimed that he did not see R.R. bleeding or know that the dogs bit her. He asserted that if he knew R.R. was bleeding, he would not have let her leave. Brooks claimed that he never raised his voice with R.R. because he did not want to wake the children. Brooks denied striking R.R. because she would not have sex with him. He admitted he had been convicted of petty theft.

At the conclusion of closing arguments, the trial court made several factual findings. The court found R.R. and Rose to be credible witnesses. The trial court found that both R.R.'s and Rose's testimony, though varying, were consistent with what R.R. told the social worker the next day.

The trial court found Brooks's testimony incredible "to some extent because he's been convicted of a crime involving lying, cheating, or . . . stealing." The court deemed Brooks's version of events an "improbable" exercise of "motor skills" given the amount of alcohol consumed. The trial court also questioned Brooks's ability to fall asleep after "what could only be analyzed as a frenetic event." The trial court observed that during the 911 call, R.R. sounded as if she was "overwrought with emotion." Additionally, the court found that R.R. sustained a four-centimeter laceration on the top of her head which required staples to close, as well as a broken nose.[4] The trial

---

[4] The trial judge based this finding upon "the medical records." Regarding R.R.'s nose injury, however, the medical records admitted at trial reflect that R.R. sustained a "possible nasal

court convicted Brooks of malicious wounding and sentenced him to 13 years of incarceration, with 10 years suspended.  Brooks appeals.

## ANALYSIS

### I. *Standard of Review*

"When reviewing the sufficiency of the evidence, '[t]he judgment of the trial court is presumed correct and will not be disturbed unless it is plainly wrong or without evidence to support it.'" *McGowan v. Commonwealth*, 72 Va. App. 513, 521 (2020) (alteration in original) (quoting *Smith v. Commonwealth*, 296 Va. 450, 460 (2018)).  "In such cases, '[t]he Court does not ask itself whether *it* believes that the evidence at the trial established guilt beyond a reasonable doubt.'" *Id.* (alteration in original) (quoting *Secret v. Commonwealth*, 296 Va. 204, 228 (2018)).  "Rather, the relevant question is whether '*any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.'" *Vasquez v. Commonwealth*, 291 Va. 232, 248 (2016) (quoting *Williams v. Commonwealth*, 278 Va. 190, 193 (2009)).  "If there is evidentiary support for the conviction, 'the reviewing court is not permitted to substitute its own judgment, even if its opinion might differ from the conclusions reached by the finder of fact at the trial.'" *McGowan*, 72 Va. App. at 521 (quoting *Chavez v. Commonwealth*, 69 Va. App. 149, 161 (2018)).

### II. *The Evidence Supports Brooks's Conviction*

Brooks argues that the trial court's error was twofold.  First, he claims that the trial court erred in finding the evidence sufficient to prove beyond a reasonable doubt that he had the requisite intent "to maim, disfigure, disable, or kill," as required under Code § 18.2-51.  Second,

---

fracture," also described as a "questionable acute nondisplaced nasal bone fracture."  At trial, the emergency treating physician testified that "what [she had] written down" indicated "a possible nasal bone fracture."

Brooks argues that the evidence failed to prove that he acted with malice. We disagree with both arguments.

A. The evidence supports that Brooks acted with specific intent.

"The 'intent to commit malicious wounding' is the intent to 'maliciously shoot, stab, cut or wound any person or by any means cause bodily injury with the intent to maim, disfigure, disable or kill[.]'" *Fletcher v. Commonwealth*, 72 Va. App. 493, 507 (2020) (alteration in original) (quoting Code § 18.2-51). But evidence of mere intent to minimally wound is insufficient to sustain a conviction under Code § 18.2-51. "To be guilty under Code § 18.2-51, a person must intend to permanently, not merely temporarily, harm another person." *Johnson v. Commonwealth*, 53 Va. App. 79, 101 (2008) (quoting *Campbell v. Commonwealth*, 12 Va. App. 476, 484 (1991) (en banc)); *accord Burkeen v. Commonwealth*, 286 Va. 255, 259-61 (2013) (finding that the "violence and brutality" of Burkeen's act in striking his victim once with his bare fist was sufficient to prove intent to maim).

"[T]he fact finder may infer that a person intends the immediate, direct, and necessary consequences of his voluntary acts." *Fletcher*, 72 Va. App. at 506 (alteration in original) (quoting *Moody v. Commonwealth*, 28 Va. App. 702, 706-07 (1998)). "Because intent is a 'state of mind,' it 'may be proved by a person's conduct or by his statements.'" *Id.* (quoting *Barrett v. Commonwealth*, 210 Va. 153, 156 (1969)). "To prove intent based on a person's conduct or statements, '[c]ircumstantial evidence is as competent and is entitled to as much weight as direct evidence, provided it is sufficiently convincing to exclude every reasonable hypothesis except that of guilt.'" *Id.* at 506-07 (alteration in original) (quoting *Coleman v. Commonwealth*, 226 Va. 31, 53 (1983)). *See also Vasquez*, 291 Va. at 249-50 ("The statement that circumstantial evidence must exclude every reasonable theory of innocence is simply another way of stating that the Commonwealth has the burden of proof beyond a reasonable doubt."). "However,

'circumstantial evidence is not to be viewed in isolation.'" *Fletcher*, 72 Va. App. at 507 (quoting *Kelly v. Commonwealth*, 41 Va. App. 250, 259 (2003) (en banc)). "While no single piece of evidence may be sufficient, 'the combined force of many concurrent and related circumstances, each insufficient in itself, may lead a reasonable mind irresistibly to a conclusion.'" *Id.* (quoting *Kelly*, 41 Va. App. at 259).

"Under ordinary circumstances an intent to maim may not be presumed from a blow with a bare fist." *Fletcher v. Commonwealth*, 209 Va. 636, 640 (1969). Nevertheless, an "assault with [a] bare fist [may be] attended with such circumstances of violence and brutality that an intent to maim, disfigure or kill may be presumed." *Id.* at 640-41. Thus, "[i]t is proper for a court to consider not only the method by which a victim is wounded, but also the circumstances under which that injury was inflicted in determining whether there is sufficient evidence to prove an intent to maim, disfigure, disable or kill." *Burkeen*, 286 Va. at 260-61.

Brooks contends that there is insufficient evidence to support the inference that he intended permanent "or even serious[]" injury to R.R. Brooks also claims that "some of the blows may have been from Brooks attempting to disarm [R.R.]." He also claims that not all of R.R.'s injuries may not be fairly traced to Brooks, as "[R.R.] fell and was bitten by dogs." Further, Brooks characterizes the events of December 15, 2021, as a "domestic altercation," a "normal fistfight," and involving "only" a "couple" of "strikes."

Brooks's attempts to minimize the severity of his conduct are unavailing. The evidence, specifically R.R.'s testimony,[5] shows that Brooks's bare-fisted blows were attended with sufficient violence as to permit the imputation of an intent to maim, disfigure, disable, or kill.

---

[5] The trial court specifically found R.R.'s testimony to be credible, and Brooks's testimony to be incredible. *See Fletcher*, 72 Va. App. at 502 ("[T]he credibility of a witness, the weight accorded the testimony, and the inferences to be drawn from proven facts are matters solely for the fact finder's determination.").

*See Fletcher*, 209 Va. at 640. After she awoke to find Brooks on top of her, R.R. "freaked out" and locked herself in the bathroom, where she waited for Brooks to go to bed. Brooks then forced his way into the bathroom and hit her multiple times in a posture of profound vulnerability—as she was seated in the bathtub. Indeed, the evidence shows that R.R. did not leave the bathtub until *after* Brooks had begun to hit her. Thus, Brooks delivered his bare-fisted blows as R.R. sat at least partially submerged in water and defenseless. Brooks struck R.R. on the head and in the face with sufficient force to cause a concussion, as well as to create a four-centimeter wound, later closed with multiple staples. The medical records indicated that R.R. also had a possible nasal fracture. Even as a possible fracture, such an injury establishes that Brooks struck R.R. with sufficient force to disfigure or maim.

In sum, these circumstances—Brooks's bare-fisted assault, delivered as R.R. was unguarded and vulnerable, coupled with injuries demonstrating a force adequate to possibly disfigure or maim—are such that an intent to maim, disfigure, disable, or kill may be presumed. *See Johnson*, 53 Va. App. at 103-05 (finding an intent to permanently injure where the attack on the victim was unprovoked); *cf. Burkeen*, 286 Va. at 261 (finding an intent to maim, disfigure, disable, or kill where the "victim did nothing to provoke the attack," was struck "with extreme force in a vulnerable area of his body while he was defenseless and not expecting such a blow," and hit in a way as to result in a "serious and disfiguring injury").

Brooks relies on *Johnson v. Commonwealth* to support his argument that he lacked the specific intent requisite of Code § 18.2-51. He contends that "none of the factors present in *Johnson* are present in the instant matter." (Emphasis added). In this, Brooks is mistaken. In *Johnson*, this Court considered whether the appellant's bare-fisted blows were delivered in a way as to prove an intent to permanently injure. 53 Va. App. at 103. We extracted several guiding principles to address whether the appellant possessed the requisite intent under Code § 18.2-51.

First, the victim in *Johnson* "did nothing to provoke [appellant's] attack[.]" *Id.* Second, we emphasized the "great force" applied in striking the victim. *Id.* at 104. The victim "suffered a concussion, two cuts in his ear, one of which necessitated four stitches, and soreness in his shoulder lasting for several weeks." *Id.* Third, we found that the appellant's "statements after the incident reveal[ed] a premeditated attack to punish [the victim] for perceived injustices in local prosecution policies." *Id.*

Several facts presented here support our reaching a similar conclusion as in *Johnson*. Though we view the evidence in the light most favorable to the Commonwealth, even according to Brooks's testimony, R.R. did nothing to provoke Brooks to attack her as she sat in the bathtub. Also, Brooks exhibited the use of "great force" in striking R.R. with such force as to cause R.R. to suffer a concussion, a head wound that required four staples, and a possible nasal fracture. And although Brooks made no post-attack statements, given his spurned sexual advances, Brooks's assault, like that of the appellant's in *Johnson*, supports a degree of premeditation. Soon after R.R. awoke to Brooks on top of her, she "freaked out," rejected Brooks's sexual advances, and retreated to the bathroom. Brooks then forced his way into the locked bathroom and struck R.R. in the head and face as she sat in the bathtub.

Accordingly, the trial court did not err in finding that Brooks possessed the intent to maim, disfigure, disable, or kill R.R. *See Towler v. Commonwealth*, 59 Va. App. 284, 297 (2011) ("Intent is a factual determination, and a trial court's decision on the question of intent is accorded great deference on appeal and will not be reversed unless clearly erroneous.").

B. The evidence supports a finding that Brooks acted with malice.

Brooks also argues that "[a]bsent some evidence that [he] acted with violence and brutality, the presumption is that a blow from bare fists is not intended to maim," and thus, "the evidence was insufficient to find that Brooks acted with" malice.

Malice "exists when a person commits 'any purposeful and cruel act without any or without great provocation.'" *Alston v. Commonwealth*, 77 Va. App. 639, 648 (2023) (quoting *Fletcher*, 72 Va. App. at 507). It "may be directly evidenced by words[] or inferred from acts and conduct which necessarily result in injury." *Id.* (alteration omitted) (quoting *Ramos v. Commonwealth*, 71 Va. App. 150, 162 (2019)). "The presence of malice 'is a question of fact to be determined by [the trier of fact].'" *Fletcher*, 72 Va. App. at 507 (alteration in original) (quoting *Long v. Commonwealth*, 8 Va. App. 194, 198 (1989)).

The trial court specifically found that "malice . . . exist[ed] because of the anger, the hatred, and the revenge of [R.R.] getting away from [Brooks]," and further found that it could "infer malice from a deliberate, willful, or cruel act against another however sudden." Brooks struck R.R., unprovoked, multiple times about the head and face, while R.R. was at least partially submerged in water in the bathtub. Brooks's blows were attended with enough force to cause a head wound, a concussion, and a possible nasal fracture. Contrary to Brooks's contention, the evidence supports a finding that he acted with sufficient violence and brutality such that malice may be presumed. *See Ramos*, 71 Va. App. at 162 ("[A]n assault with a bare fist may be attended with such circumstances of violence and brutality that [malice] may be presumed." (second alteration in original) (quoting *Fletcher*, 209 Va. at 640)).

The trial court's finding that Brooks acted with malice was neither wrong nor unsupported by the evidence. *See Meade v. Commonwealth*, 74 Va. App. 796, 814 (2022) ("Because this represents a factual finding of the trial court, we are bound by the conclusion 'unless it appears from the evidence that the judgment is plainly wrong or without evidence to support it.'" (quoting *Wood v. Commonwealth*, 57 Va. App. 286, 292 (2010))). Therefore, the trial court did not err in finding that Brooks acted with malice in his attack on R.R.

## CONCLUSION

For the foregoing reasons, we affirm the judgment of the trial court.

*Affirmed.*