COURT OF APPEALS OF VIRGINIA

UNPUBLISHED

Present: Judges AtLee, Athey and Bernhard

HOUSTON EVERETT NORRIS

v.      Record No. 0466-25-3

COMMONWEALTH OF VIRGINIA

MEMORANDUM OPINION[*]
PER CURIAM
FEBRUARY 17, 2026

FROM THE CIRCUIT COURT OF WASHINGTON COUNTY
Eric R. Thiessen, Judge

(Michael J. Letsen; Letsen Law Firm, PLLC, on brief), for appellant.
Appellant submitting on brief.

(Jason S. Miyares,[1] Attorney General; Victoria Johnson, Senior
Assistant Attorney General, on brief), for appellee.

A jury empaneled in the Circuit Court of Washington County ("trial court") convicted

Houston Everett Norris ("Norris") of unlawful wounding, abduction, and rape. Norris was

subsequently sentenced to 65 years' imprisonment, with 35 years suspended. On appeal, Norris

assigns error to the trial court denying his motion to strike based upon having found the evidence in

support of his convictions for abduction and rape sufficient.[2] Finding no error, we affirm the trial

court's judgment.[3]

---

[*] This opinion is not designated for publication. *See* Code § 17.1-413(A).

[1] Jay C. Jones succeeded Jason S. Miyares as Attorney General on January 17, 2026.

[2] Norris does not challenge his conviction for unlawful wounding.

[3] Having examined the briefs and record in this case, the panel unanimously agrees that
oral argument is unnecessary because "the appeal is wholly without merit." *See* Code
§ 17.1-403(ii)(a); Rule 5A:27(a)

# I. Background[4]

In October of 2022, a grand jury indicted Norris for abduction, malicious wounding, strangulation, and rape, in violation of Code §§ 18.2-47, -51, -51.6, and -61, respectively. Following the resolution of pre-trial motions, the matter was set for a two-day jury trial that began on December 12, 2023.

Following opening statements, the Commonwealth called the victim—Norris's ex-girlfriend, C.S.—to the stand.[5] C.S. testified that on April 3, 2022, she traveled to the home of Norris's father in Washington County. She explained that she and Norris used to live there "on and off" when they were previously dating. She further recalled that they could access a "separate little area" from "a door on the side of the house." C.S. further explained that this "separate little area" was comprised of Norris's bedroom. C.S. also described that there was a door that connected Norris's bedroom to the remainder of the house.

C.S. testified that she arrived at the home in the middle of the night while high on methamphetamine. She further explained that Norris was already there with "some people" she knew, including Norris's current girlfriend, and all of them were using illegal drugs.

After Norris's current girlfriend left the house the following morning, C.S. testified that Norris repeatedly "asked [her] how [she] was going to prove to him that [she] loved him." She further explained that "when [she] wouldn't give him a good answer, [she] would get hit" with

---

[4] "Consistent with the standard of review when a criminal appellant challenges the sufficiency of the evidence, we recite the evidence below 'in the "light most favorable" to the Commonwealth, the prevailing party in the trial court.'" *Hammer v. Commonwealth*, 74 Va. App. 225, 231 (2022) (quoting *Commonwealth v. Cady*, 300 Va. 325, 329 (2021)). This standard "requires us to 'discard the evidence of the accused in conflict with that of the Commonwealth, and regard as true all the credible evidence favorable to the Commonwealth and all fair inferences to be drawn therefrom.'" *Cady*, 300 Va. at 329 (quoting *Commonwealth v. Perkins*, 295 Va. 323, 324 (2018)).

[5] We use the victim's initials to protect her privacy.

his fists. C.S. also recalled Norris hitting her in the face and head "[r]eally hard," blackening both of her eyes and breaking her nose. She then testified that Norris subsequently barred entry or exit through his bedroom door by using "a makeshift metal stick and put[ting] it on the door." As a result, C.S. could not readily leave or escape into the remainder of the house. She explained that she could open the bedroom door "[f]rom the inside of his bedroom," but someone could not open it from the other side. In addition, she acknowledged that the door permitting her to go outside was not barred.

C.S. also testified that neither she nor Norris slept over the next two-day period. C.S. further admitted that they both used methamphetamine during this two-day period, but she also testified that Norris "wouldn't let [her] sleep" because he continued to ask her, "[H]ow are you going to show me that you love me[?]" She also stated that Norris continued to beat her when she answered to his dissatisfaction. She recalled that "he would beat [her] up" but then "would stop for a little bit and . . . make [her] think that [they] were going to be okay." She testified that she "was just afraid of him" due to his behavior. C.S. also testified that Norris made other statements that scared her, including that "he would rape [C.S.'s] youngest" daughter.

C.S. testified that Norris then started asking her "to go to [her] boyfriend's home and do something, do anything to prove to [Norris] that [she] love[d] [him]." She concluded that Norris "wanted [her] to do something to hurt [her boyfriend]." C.S. then recounted how Norris drove her to her boyfriend's home expecting her to hurt him but noticed security cameras outside the house when they arrived. C.S. next testified that Norris "started hitting [her]" inside the car "so that it would be visible on footage." When they started driving back to the home of Norris's father, C.S. described how Norris eventually stopped the vehicle and held a nine-millimeter gun to her head, ordering her to "tell him one good reason why [he] should not shoot [her] right now." C.S. recalled screaming just before Norris "shot the gun off out the window next to [her]

- 3 -

head." C.S. added that Norris continued driving, later threatening her with the gun again in the vehicle, but that time he did not fire the weapon.

C.S. further testified that she did not get out of Norris's vehicle and leave because she "could barely function" after "having a gun put to [her] head." She also explained that she thought "[she] was going to die" before eventually returning to Norris's father's home.

According to C.S., "[a] couple of days" later Norris drove her to her boyfriend's home a second time. She recalled Norris pulling right up to the house and "taunted" her, trying to get C.S. to hurt her boyfriend by saying, "Go ahead," "Do it," and "I dare you." She also confirmed that Norris was armed with his gun when they arrived. She got out of Norris's car, ran to her boyfriend's house, and banged on the doors and windows, but no one responded. Norris then drove away and left her there. C.S. testified that she walked for about 45 minutes, intending to go to her mother's home, but Norris appeared in his vehicle with one of his female friends. C.S. explained that she joined them because she was exhausted, injured, and unable to "outrun him." They then traveled to a home in Atkins, where C.S. showered and rested for a few hours before Norris drove them back to his father's house. At that point, C.S. had been with Norris for five days.

When they arrived back at the home of Norris's father, she returned to Norris's bedroom whereupon Norris hit and choked her while again demanding that she prove that she loved him. C.S. testified that Norris, using both of his hands, strangled her to the point that she urinated on herself twice. She also testified that on another occasion while Norris kept her in his room, Norris, who was wearing steel-toed boots, kicked her in the chest. C.S. said that, afterward, she was in pain and "it was very hard to breathe."

C.S. then testified that the next day, Norris "made [her] take [her] clothes off . . . and he'd ask for [her] to dance." She described that since she "couldn't dance," Norris "made [her] go sit

in a corner," called her "a mutt," and said, "Get over here and suck my dick." C.S. said that she refused. C.S. then testified that Norris "made [her] have sex with him" on his bed. C.S. recalled that she told him to stop but explained that Norris was on top of her, and she could not escape.

C.S. also recalled a time during the time period she was with Norris when Norris's current girlfriend drove her to a grocery store near the home. She testified that Norris's girlfriend entered the store, leaving C.S. alone in the car. C.S. testified that she did not flee the car because she feared Norris would appear suddenly and shoot her. C.S. emphasized that the grocery store was "very close to [the] house" and she was "afraid" that "[Norris] would just pop out of nowhere" to hurt her.

C.S. then testified that on the night of April 10, 2022, C.S. used Norris's cell phone to call her mother for help on FaceTime after Norris put it down. C.S. noted that Norris knew she was on his phone and witnessed her call. C.S. explained that while talking to her mother, she was "trying to back out of th[e] door that [Norris] had the bar on" in an effort to escape. She testified that Norris meanwhile "had gotten the gun" and "kept showing" it to C.S. while also saying, "I didn't [injure] you. Your boyfriend did that to you." C.S. recalled only repeating, "Mom," on the call because she was "afraid to say anymore because [she] was afraid [Norris] was going to shoot [her]." C.S. then testified that she removed the bar on the door, backed out of Norris's bedroom, and went to wait for her mother to arrive. But instead, C.S. explained, the police appeared instead.[6]

C.S. testified that at first, she refused medical treatment because she "didn't know the extent of [her] injuries" and "just wanted to go home and [for] it to be over and [to] go to sleep."

___

[6] A few days before their April 10 call, C.S.'s mother reported that C.S. was missing to law enforcement. When C.S. contacted her mother over video on April 10, C.S.'s mother observed that her daughter was distressed and injured, bearing bruises on her face. While they talked, other relatives in C.S.'s mother's home contacted the police.

But before she left, C.S. recalled providing a written statement to the police where she did not mention that Norris had raped her. She then testified that she left the house that night with her mother and family members who came to get her. But, C.S. testified, she eventually went to the hospital because her mother and family members noticed that she had difficulty breathing. C.S. recalled being treated at the hospital for several days to address a collapsed lung and other injuries to her body. She further testified that once she was at the hospital, she told a police officer that she had been raped but declined a forensic examination to collect evidence because she was more worried about her collapsed lung.

The Commonwealth also called Deputy Matthew Trent ("Deputy Trent") of the Washington County Sheriff's Office. He testified that on April 10, 2022, he was dispatched to Norris's father's home because "a female subject was being held . . . against her will." Deputy Trent recalled arriving on scene and opening an unlocked door that led to C.S. He testified that C.S.'s eyes were blackened and that she appeared "timid[,] as if she didn't want anybody to know that we were speaking with her." Later, the Commonwealth called Detective Seth Sparks ("Detective Sparks"), who testified that when he arrived at Norris's father's home, he spoke with C.S. who told him that "she was being held against her will by [Norris]." Detective Sparks also recalled C.S. telling him that Norris had beaten her and kept her there for about five days.

Additionally, the Commonwealth called Deputy Brian Stainker ("Deputy Stainker"), who recounted an interview he conducted of Norris on April 12, 2022, after Norris's arrest. He testified that in the interview, Norris said that one night C.S. "just randomly showed up at his home." Deputy Stainker also explained that when asked about C.S.'s injuries, Norris said his elbow "lightly struck" her "by accident" and, on another occasion, he had given her a "light[] open hand" slap. Deputy Stainker then recounted pressing Norris about how C.S. received her injuries, with Norris responding that he and C.S. had engaged in "verbal altercations." Norris

also said that he drove C.S. to another man's home who must have inflicted C.S.'s injuries. Deputy Stainker also recalled Norris saying that he and C.S. had one consensual sexual encounter while she was with him.

Following the completion of the Commonwealth's case in chief, Norris moved to strike the evidence because "the Commonwealth ha[d] failed to prove each of the elements for each of the . . . counts." Norris also specifically contended that the Commonwealth failed to prove abduction because "[C.S.] admitted that she left the home multiple times" and whether "she felt like she was scared to leave" was "not one of the elements of the crime." In addition, with respect to the malicious wounding indictment, Norris contended that "the Commonwealth [could not] show the requisite intent" and was only able to show that "[Norris] was trying to hurt her, but that's a far cry from attempting to kill her or attempting to maim her." After considering the argument of counsel, the trial court denied Norris's motion to strike.

Norris then testified on his own behalf that C.S. had not been invited to his father's home in April of 2022 and that, when she arrived, she was "kind of out of it" and "disoriented." Norris also testified that C.S., on her own free will, stayed with him that night as well as the days that followed. Norris further testified that he never prevented C.S. from leaving his home; instead, he repeatedly asked her to leave, but she refused to do so. Norris acknowledged that he drove C.S. to her boyfriend's house twice and that the first time, she refused to get out of the car. He further explained that the second time she was taken to her boyfriend's home, he left C.S. there before encountering her again later that day and picking her up in his vehicle. Norris also admitted that he "open-palm smacked" C.S. and elbowed her while trying to get her to leave his house. In his defense, he claimed that C.S. sustained her black eyes and other injuries after he dropped her off at her boyfriend's house. Norris further claimed that he offered to take C.S. to get medical treatment but she refused. He also admitted to having sexual intercourse with C.S. but

- 7 -

emphasized that she initiated it and that it was consensual. He denied either strangling C.S. or having sex with her against her will. Norris also admitted that he left the house on April 10 and, as a result, did not communicate with the police when they responded to his father's house. He explained that he was attempting to avoid the "drama" that C.S. was causing. Norris also admitted that he had prior felony convictions.

At the conclusion of all the evidence, Norris renewed his motion to strike, which was denied by the trial court. The jury was instructed, the parties made closing statements, and the jury retired to deliberate. Following its deliberations, the jury convicted Norris of unlawful wounding, abduction, and rape.[7] Norris appealed.

## II. ANALYSIS

### A. *Standard of Review*

"When an appellate court reviews the sufficiency of the evidence underlying a criminal conviction, its role is a limited one." *Commonwealth v. Garrick*, 303 Va. 176, 182 (2024). "The judgment of the trial court is presumed correct and will not be disturbed unless it is 'plainly wrong or without evidence to support it.'" *Pijor v. Commonwealth*, 294 Va. 502, 512 (2017) (quoting Code § 8.01-680). "Thus, 'it is not for this [C]ourt to say that the evidence does or does not establish [the defendant's] guilt beyond a reasonable doubt because as an original proposition it might have reached a different conclusion.'" *Commonwealth v. Barney*, 302 Va. 84, 97 (2023) (alterations in original) (quoting *Cobb v. Commonwealth*, 152 Va. 941, 953 (1929)). "If there is evidentiary support for the conviction, 'the reviewing court is not permitted to substitute its own judgment, even if its opinion might differ from the conclusions reached by the finder of fact at

---

[7] The jury convicted Norris of unlawful wounding as a lesser included offense of malicious wounding and acquitted him of two counts of strangulation.

the trial.'" *McGowan v. Commonwealth*, 72 Va. App. 513, 521 (2020) (quoting *Chavez v. Commonwealth*, 69 Va. App. 149, 161 (2018)).

B. *The Commonwealth presented sufficient evidence to support Norris's conviction for abduction.*

Norris claims that the trial court erred in denying his motion to strike the abduction charge because he "never denied [C.S.] of personal liberty" since C.S. voluntarily left, and returned to, the home several times between April 3 and April 10. We disagree.

A person is guilty of abduction if he, "by force, intimidation or deception, and without legal justification or excuse, seizes, takes, transports, detains or secretes another person with the intent to deprive such other person of his personal liberty." Code § 18.2-47(A). This crime does not require asportation, meaning that a defendant may commit abduction even when they do not move their victim from one place to another. *See Scott v. Commonwealth*, 228 Va. 519, 526 (1984). A defendant can commit abduction by making the victim "remain in a certain location, or even in a certain position," through force, intimidation, or deception. *Burton v. Commonwealth*, 281 Va. 622, 628 (2011). And "[t]he abduction statute does not contain a temporal requirement," meaning that "a victim can be detained under the statute even if only for the briefest of moments." *Brown v. Commonwealth*, 74 Va. App. 721, 732-33 (2022). As such, "[a]bduction 'may be accomplished by a minimal amount of force and each case will depend upon the particular facts of the [detainment].'" *Clanton v. Commonwealth*, 53 Va. App. 561, 574 (2009) (en banc) (quoting *Stancil v. State*, 553 A.2d 268, 273 (Md. Ct. Spec. App. Feb. 9, 1989)).

The defendant must also have the "specific intent to deprive [the victim] of her liberty." *Brown*, 74 Va. App. at 731. "Intent is the purpose formed in a person's mind and may be, and frequently is, shown by circumstances." *Barrett v. Commonwealth*, 210 Va. 153, 156 (1969). It "may be proved by a person's conduct or by his statements." *Id.* "This 'factual question,' as always, 'lies peculiarly within the province of the [factfinder].'" *Walker v. Commonwealth*, 47

- 9 -

Va. App. 114, 121 n.5 (2005) (alteration in original) (quoting *Hughes v. Commonwealth*, 18 Va. App. 510, 519 (1994)). "[T]he factfinder determines which reasonable inferences should be drawn from the evidence, and whether to reject as unreasonable the hypotheses of innocence advanced by a defendant." *Commonwealth v. Moseley*, 293 Va. 455, 464 (2017).

Here, the evidence was sufficient to show that Norris detained C.S. by force with the intent to deprive her of her liberty. Although C.S. arrived at Norris's father's house on her own, there were periods of time when Norris held her there against her will. After C.S. spent one night at the house, Norris became violent toward her and refused to let her leave his bedroom. For several days, Norris repeatedly demanded that C.S. explain how she could show her love for him. When Norris was unsatisfied with C.S.'s answers, he beat her, blackened her eyes, and broke her nose. Norris further kept C.S. awake by continuously asking her to prove her love to him and subsequently beating her while, at the same time, preventing her from leaving his bedroom by barring the bedroom door. Norris further restricted her liberty while she was in his vehicle by pointing a gun at her, firing the gun out of the window next to her head, and then threatening to shoot her next. Finally, after days of physically battering C.S., Norris commanded her to a corner of the room, calling her a "mutt." Taken as a whole, the Commonwealth's evidence shows that Norris detained C.S. by force with the intent to deprive C.S. of her liberty. *See Walker v. Commonwealth*, 74 Va. App. 475, 491-92, 494-95 (2022) (holding that a defendant abducted a victim by walking into a bank pointing a gun "everywhere," which caused a victim to "go to the ground and remain there"), *aff'd*, 302 Va. 304 (2023).

Norris contends that C.S. actually left his bedroom of her own volition which, he claims, negates any evidence that he intended to deprive C.S. of her liberty. However, whether C.S. escaped "does not preclude a finding that [Norris] detained [C.S.] prior to that point." *Brown*, 74 Va. App. at 732; *see Carr v. Commonwealth*, 69 Va. App. 106, 115 (2018) ("[A victim's]

- 10 -

eventual escape . . . d[oes] not preclude the fact finder from concluding that appellant intended to deprive [the victim] of her personal liberty at the time [of the abduction].").  It also matters little that C.S. had opportunities to escape during the ordeal either while in Norris's vehicle or at the grocery store.  In fact, that she did not escape evinces just how afraid C.S. was of Norris retaliating against her if she left completely.[8]  *See Brown*, 74 Va. App. at 732 ("A defendant intimidates a victim if he 'put[s] [the] victim in fear of bodily harm by exercising such domination and control . . . as to . . . overbear her will.'" (alterations in original) (quoting *Sutton v. Commonwealth*, 228 Va. 654, 663 (1985))).  Accordingly, the jury could reasonably infer that Norris had the intent to deprive C.S. of her liberty even though she had opportunities to escape because he still repeatedly battered her, controlled when she went to her boyfriend's home, and dictated many of her movements in Norris's bedroom.  Hence, we find Norris's assertions unavailing.

Finally, the jury was not required to accept Norris's testimony that he did not prevent C.S. from leaving the home or use force to keep her there against her will.  Determining witness credibility "is within the exclusive province of the [factfinder], which has the unique opportunity to observe the demeanor of the witnesses as they testify."  *Dalton v. Commonwealth*, 64 Va. App. 512, 525 (2015) (quoting *Lea v. Commonwealth*, 16 Va. App. 300, 304 (1993)).  The factfinder "[i]s free to believe or disbelieve, in part or in whole, the testimony of any witness." *Bazemore v. Commonwealth*, 42 Va. App. 203, 213 (2004) (en banc); *see Rollston v. Commonwealth*, 11 Va. App. 535, 547 (1991).  So when the trier of fact has resolved credibility issues in favor of the Commonwealth, "those findings will not be disturbed on appeal unless plainly wrong."  *Towler v. Commonwealth*, 59 Va. App. 284, 291 (2011) (quoting *Corvin v.*

---

[8] This is informed by the fact that on the occasion C.S. did try to walk to her mother's house, Norris found her and picked her up in his vehicle.

*Commonwealth*, 13 Va. App. 296, 299 (1991)). Here, there is no evidence in the record that the jury's impression regarding Norris's credibility was plainly wrong or without evidence to support it. Moreover, the jury could have also properly considered Norris's prior felony convictions in assessing his credibility. *See* Code § 19.2-269. Ultimately, the jury heard all the evidence and simply concluded that C.S. was more credible than Norris. We will not disturb that finding. *See Dalton*, 64 Va. App. at 525.

Thus, we find that the jury could have reasonably found that the totality of the evidence proved beyond a reasonable doubt that Norris detained C.S. in his bedroom against her will by force with the requisite intent. Accordingly, the trial court did not err in denying Norris's motion to strike the abduction charge.

C. *Norris waived his challenge to his conviction for rape.*

Norris next contends that the trial court erred by denying his motion to strike the rape charge. Since Norris failed to preserve this argument on appeal, we decline to address this assignment of error.

"No ruling of the trial court . . . will be considered as a basis for reversal unless an objection was stated with reasonable certainty at the time of the ruling, except for good cause shown or to enable this Court to attain the ends of justice." Rule 5A:18. "The purpose of th[e] contemporaneous objection requirement [in Rule 5A:18] is to allow the trial court a fair opportunity to resolve the issue at trial, thereby preventing unnecessary appeals and retrials." *Creamer v. Commonwealth*, 64 Va. App. 185, 195 (2015). "Not just any objection will do. It must be both specific and timely—so that the trial judge would know the particular point being made in time to do something about it." *Dickerson v. Commonwealth*, 58 Va. App. 351, 356

- 12 -

(2011) (emphasis omitted). If a party fails to timely and specifically object, he waives his argument on appeal. *Arrington v. Commonwealth*, 53 Va. App. 635, 641 (2009).[9]

Norris failed to properly move to strike the rape charge on the same grounds he raises on appeal. At the conclusion of the Commonwealth's case-in-chief, Norris made a general motion to strike all five pending charges because "the Commonwealth failed to prove each of the elements" of the offenses. Norris then made specific arguments while moving to strike his abduction charge, specifically asserting that "[C.S.] admitted that she left the home multiple times" and whether "she felt like she was scared to leave" was "not one of the elements of the crime." He made no such specific arguments to challenge his rape charge. And instead of adding specificity to his objection for all charges at the conclusion of all the evidence, Norris merely renewed the "same arguments" made in his previous motion to strike without making any specific reference to any of the elements of rape. But he raises a more precise argument on appeal, claiming that the Commonwealth failed to prove that he had sexual intercourse with C.S.'s against her will by force, threat, or intimidation. By making no specific argument in the trial court that the Commonwealth failed to prove that the sexual intercourse was against C.S.'s will and completed through force, threat, or intimidation, Norris failed to preserve any such claim for consideration on appeal. *Arrington*, 53 Va. App. at 641. Accordingly, Rule 5A:18 bars our consideration of this assignment of error.

### III. CONCLUSION

For these reasons, we affirm the trial court's judgment.

*Affirmed.*

---

[9] Norris does not invoke the good cause or ends of justice exceptions to Rule 5A:18, and the Court will not apply them sua sponte. *See Edwards v. Commonwealth*, 41 Va. App. 752, 761 (2003) (en banc), *aff'd by unpub'd order*, No. 040019 (Va. Oct. 15, 2004).